In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 11-2267, 11-2288, 11-2535 & 11-2687

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENNETH JONES, RAMONE MOCKABEE,
DEVON YOUNG and ELISHA DRAKE,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:10-cr-00003-SEB-KPF — **Sarah Evans Barker**, *Judge.*

_____

ARGUED MAY 29, 2013 — DECIDED AUGUST 18, 2014

_____

Before WOOD, *Chief Judge*, and BAUER and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Beginning in August of 2009, the Indianapolis Metropolitan Police Department (IMPD) and the FBI conducted a coordinated investigation of a suspected cocaine-distribution organization operating in the Indianapolis area. The two law enforcement agencies employed a va-

riety of investigative techniques, including interviews of confidential informants and suspects, surveillance, staged or controlled drug purchases, and consensual (on one side) recording of telephone conversations. In addition, the investigation utilized court-authorized pen registers of telephone traffic, wiretaps of telephone conversations, and interdiction stops of selected individuals, which were often initiated on the basis of information gleaned from those wiretaps.

This coordinated law enforcement operation continued until January 20, 2010, when a series of searches and arrests were effectuated. A federal grand jury in the Southern District of Indiana then issued an indictment (and subsequently, a superseding indictment) that leveled charges related to the distribution of drugs against twenty defendants, including the appellants in this case, Ramone Mockabee, Kenneth Jones, Elisha Drake, and Devon Young. Jones, Drake, and Young contested the charges against them at a jury trial, but were all convicted. Mockabee pleaded guilty.

We will discuss the particulars of the counts of conviction and the penalties imposed later. For now, we note that all appellants individually raise a variety of pretrial, trial, and sentencing issues, and we have consolidated their appeals. Ultimately, we affirm the convictions that Jones, Drake, and Young now appeal, but we vacate the sentences of Mockabee, Jones, and Drake, and remand their cases for resentencing. Before we tackle the multitude of separate issues raised by each appellant, however, we will first discuss the evidence and procedures common to all of them, and then discuss specific facts relating to each one in turn.

## I. Background on the Evidence

In this cocaine-distribution organization, appellant Mockabee was the central figure. Mockabee obtained his supply of powder cocaine from Dominic Robinson and Damon Luter. After obtaining powder cocaine, Mockabee stored it at a house located at 781 West 25th Street in Indianapolis, which was his center of operation. There he would also cook some of the powder into crack cocaine. Mockabee's distribution method functioned through a regular routine as follows. His customers would telephone him, and through the use of coded language—asking questions such as, "Are you down the way?"—they would express their interest in acquiring cocaine. If the inquiry met with a favorable response, the customer would travel to the 25th Street residence and knock on the back door. Upon hearing a knock, Mockabee would admit only one person at a time, even if several were lined up outside the residence waiting to enter.

Once inside the 25th Street residence, customers would either be allowed to go up to the kitchen and deal with Mockabee, or they would go downstairs to deal with a separate supplier named Diomoni Small. One customer, Seron Poole, testified at trial that once or twice a week, he had purchased one to two ounces in this manner from Mockabee beginning in the fall of 2008 and lasting until the summer of 2009. Another customer, Devon Hudgins, testified that he had purchased between one-eighth and three-eighths ounces of crack from Mockabee two or three times a month from the summer of 2009 until December of that year.

Utilizing court-authorized wiretaps, the coordinated FBI-IMPD investigation monitored four target cell phones from late November 2009 through January of the following year.

No. 11-2267 App. Dkt. 78-1, 20-27. The case agent in charge of the wiretap investigation was IMPD Detective Ryan Clark, who was a member of the FBI Safe Streets Task Force.[1] At the joint trial of Jones, Drake, and Young, Detective Clark testified that the principal users of these four target phones were Mockabee, Small, Lonnie Belmar (another supplier operating from a residence nearby at 736 West 25th Street), and Robinson. No. 11-2267 App. Dkt. 78-1, 20-27.

The wiretapping of these four target phones resulted in the interception of over 10,000 telephone conversations. At trial, the government played recordings and provided written transcripts of several intercepted phone calls in an attempt to link the appellants to the cocaine-distribution organization. But because the participants in these intercepted phone conversations did not "use words like 'cocaine,' 'crack cocaine,' or 'powder cocaine,'" Detective Clark provided opinion testimony about the meaning of the words actually used. Clark asserted that participants in these conversations were speaking in a "coded language" in an attempt to hide their cocaine-distribution activities. No. 11-2267 App. Dkt. 78-2, 97. Hudgins similarly testified that the speakers in phone conversations avoided using words like "crack cocaine" and "crack" because if someone was listening, "then they'd know what we was talking about." Trial Tr. vol. 1, 95–96, Jan. 10, 2011. In addition to the wiretapped phone calls and Clark's supporting testimony, the government presented testimony from individuals who had been involved in the conspiracy as well as testimony from other

---

[1] The FBI Safe Streets Task Force is composed of FBI agents and local law enforcement officers who "concentrate[] on gang investigations, criminal enterprise investigations, bank robberies, and violent crimes."

law enforcement officials. We turn to an examination of the evidence relevant to each of the three individual appellants—Drake, Young, and Jones—who went to trial.

### A. Evidence Relevant to Drake

The first overheard conversation introduced at trial against Drake began on November 27, 2009, when Drake asked Mockabee if she could "holler at" him. Detective Clark testified that, based on his training and experience, Drake was asking Mockabee if she could purchase crack cocaine from him. No. 11-2267 Dkt. 78-2, 121-22. A few weeks later, on December 14, Drake asked Mockabee if she could "slide through." Mockabee responded by asking her an unusual question: "Is it the same address?" Drake replied that it was. Clark told the jury that "same address" was a coded term meaning the same amount of cocaine Drake had acquired during her last purchase. Because Drake had previously ordered "one," Clark believed that Drake was asking Mockabee if she could come to the 781 West 25th Street residence so she could purchase one ounce of crack cocaine.

On the witness stand, Clark soundly rebutted any suggestion that "same address" referred to an actual street address, noting, "Ms. Drake is driving to Mr. Mockabee. He's stationary at a location. He wouldn't ask the address of where he already was." *Id.* at 171-72. Drake and Mockabee spoke again that day, approximately six hours later. In that conversation, Drake requested permission to "fly through real quick," to which Mockabee responded by asking whether she wanted the "same address." Clark again explained that he understood "same address" to mean the same amount of cocaine as before. No. 11-2267 App. Dkt. 78-3, 5-6. Clark's interpretation was consistent with Hudgins's

testimony that "address" was a common code word Mockabee used, and when Mockabee asked for the address, he was asking how much crack Hudgins wanted.

Drake and Mockabee were overheard talking again the next day, with Drake inquiring whether he was "ready." Mockabee responded that he was "shut down." Although he was "putting his apron on the last stuff," he presently "had nothing but cataracts," and it would "probably be tomorrow." Detective Clark interpreted Mockabee's remarks to mean that "[Mockabee] had already sold the last of" his cocaine, he presently had nothing but marijuana, and it would probably be tomorrow before he had cooked more crack to sell. No. 11-2267 App. Dkt. 78-3, 5-6. This testimony was supported by Hudgins's testimony that when he called Mockabee on the phone he would say something like "are you ready for me," or "are you down the way," which meant that he wanted to obtain some crack cocaine. Trial Tr. vol. 1 96, Jan. 10, 2011. Hudgins also testified that when Mockabee told him, "I'm shut down," Hudgins understood him to mean that he had no crack cocaine. *Id.* at 109. Finally, Hudgins testified that when Mockabee said he was "putting my apron on" Mockabee meant that he was cooking cocaine into crack. Trial. Tr vol. 1, 98.

Six days later, on December 21, Drake called Mockabee, asking, "Still nothin'?" to which he responded, "I ain't called you yet." Clark interpreted this conversation as an inquiry about the availability of cocaine with a negative response. Then five days later, Drake was overheard asking Mockabee if he was "still out." Mockabee responded, "[I]t'll probably have to be tomorrow…. I have to put that shit together." Clark concluded that "shit" referred to cocaine, and that

Mockabee needed to get more cocaine to distribute to Drake. No. 1-2267 App. Dkt. 78-3, 22-23.

Mockabee and Drake continued to have similar conversations over the course of the next two weeks. On December 28, 2009, Mockabee told Drake, "Ain't nuttin' yet. I ain't called you yet, Kelly,"—Kelly was a nickname of Drake's—which Clark interpreted to mean that Mockabee "still ha[d]n't obtained any cocaine." *Id.* at 23-24. On December 31, Drake again asked Mockabee if she could "slide through." *Id.* at 28. On January 4, 2010, Drake asked Mockabee if she could "holla" at him, which Clark interpreted to mean "come and make a purchase of crack cocaine from Mockabee." *Id.* at 39. A little over an hour later, Drake asked Mockabee if he was "ready," and he responded affirmatively. Clark's take on that conversation was that "ready" meant "ready to make a sale of crack cocaine" to Drake. *Id.* at 40. Hudgins similarly testified that when Mockabee said that he was "ready to take care of something" it meant that he "still wasn't ready, … he still had to cook" the crack cocaine. Trial Tr. vol. 1, 112, Jan. 10, 2011. This conversation between Drake and Mockabee followed Mockabee's receipt of a kilogram of cocaine from Damon Luter by about four hours.

Finally, on January 9, 2010—in what may have been a pivotal conversation with respect to the government's theory that Drake was a member of the Mockabee cocaine-distribution conspiracy—Mockabee told Drake, "[Y]ou doin' some, uh … slippin' in your pimpin'. You need to be careful, man, what you doin.'" Detective Clark explained that in this remark, Mockabee was "cautioning Ms. Drake on how she's handling her [drug trafficking] business transactions." Drake responded to Mockabee's comment by denying that she had

been "trippin' on shit," and by assuring Mockabee that he could "talk about my business, but you about the only one that can … my business is your business … just like yours is mine." No. 11-2267 App. Dkt. 78-3, 53.

In addition to Drake's conversations with Mockabee, Clark and his team overheard Drake's conversations with other involved parties via wiretap. For example, on November 8, 2009, they overheard Drake asking Lonnie Belmar if she could come "holler at" him. When Belmar gave an affirmative response, Drake then told Belmar, "I'm 'bout to go holler at her real quick and I'll be back to holler at you." Clark testified that this statement meant Drake had to meet with one of her cocaine customers before she could meet with Belmar to purchase cocaine. No. 11-2267 Dkt. 78-2, 122-23.

Drake was also intercepted during a December 12, 2009, phone conversation with Belmar, in which she mentioned law enforcement activity in the neighborhood. She told Belmar that the police "got a nigga stretched out in the alley" near the house from which Belmar distributed crack cocaine. She also said, "[Y]ou all make sure you be careful when you all head to the hood." Clark described this conversation as a warning to Belmar about police activity near his crack distribution location. Drake had apparently been in the neighborhood to witness the law enforcement activity because she "had one of [her] stings call … want[ing] some." Clark told the jury that "sting" referred to a cocaine customer, and "some" meant cocaine. In this conversation, Drake further remarked to Belmar that although she "didn't have shit on [her]," she had "seen all that" and "was like shit, I'm gettin' the fuck away from here." Belmar responded by ask-

ing if Drake had called "Mone." Clark explained that "Mone" referred to the defendant Ramone Mockabee. No. 11-2267 Dkt. 78-2, 153.

### B.  Evidence Relevant to Young

The government also presented wiretapped conversations involving appellant Young. Specifically, it presented intercepted conversations between Young and Belmar as well as between Young and Mockabee. Of all the conversations replayed at trial for use against Young, perhaps the most damaging conversation involved Belmar.

Before the prosecution played a recording of the telephone conversation between Young and Belmar from December 8, 2009, Detective Clark first provided some background about the process of turning powder cocaine into crack cocaine, noting, "Powder cocaine is taken and mixed with a certain amount of cutting agent, usually baking soda. Water's added to that. It's boiled. In the boiling process, the oils and the moisture in the cocaine evaporate, and you're left with a hard, solid substance, which is crack cocaine." No. 11-2267 Dkt. 78-2, 143–44. The prosecution then played the December 8th conversation, in which Young was overheard telling Belmar, "My person has some software, it won't get hard when you cook it." Belmar responded by advising Young to "melt it down," "pour the water off," "throw [baking] soda on it," and "keep stirring it up." Young later told Mockabee that the person with the software "owe[d]" him. Detective Clark testified that the "person" with the troublesome "software" discussed in this conversation was likely one of Young's customers. Clark further suggested that this particular customer was in a "fronting" relationship with Young, such that Young had given cocaine to this customer

"on consignment," and the customer now owed Young money "on the back end." No. 11-2267 Dkt. 78-2, 144–48.

Young's wiretapped conversations with Mockabee certainly did not help his case either. For example, the prosecution played a recording of a January 7, 2010 conversation, in which Young was overheard telling Mockabee that he "was trying to come up this way," and Mockabee responded, "It'd be a couple hours." No. 11-2267 Dkt. 78-3, 42. Detective Clark interpreted this conversation to mean that Young wanted to purchase cocaine from Mockabee, but Mockabee was not presently available. In subsequent conversations that day, Young continued to ask Mockabee if he was "ready."

Once Mockabee responded affirmatively in a conversation on January 8 (by saying, "I'll be there in ten minutes"), Young told Mockabee that he "probably needed the same thing." Clark interpreted this statement to mean that Young needed the "same amount of cocaine that he had previously obtained from Mr. Mockabee." *Id.* at 44. Based on this interpretation of the January 8 conversation, law enforcement believed that a drug transaction between Mockabee and Young was imminent at the 781 West 25th Street residence. As a result, law enforcement officers stopped Young's vehicle after it left the residence that day. Finding Young and his associate, Gary Davis, in the car, police recovered 41.9 grams of powder cocaine from Davis's crotch area.

At trial, three witnesses—Gary Davis, Ernest French, and Brooke Taggart—all testified that Young was more than just a mere buyer of cocaine; rather, he was actively engaged in the sale of cocaine to others. Davis, an Indianapolis native who had been using illegal drugs since age twenty, spent the

three years between 2005 and 2008 in Kentucky getting clean and sober. Upon moving back to Indianapolis, Davis promptly became reacquainted with two of his old friends: Young and crack cocaine. No. 11-2267 App. Dkt. 78-2, 30-39. Davis's rekindled friendships soon convinced him to begin working for Young; Young, in turn, would compensate Davis in crack cocaine. According to Davis's testimony, this arrangement began after Young approached him in October 2008 and asked Davis to accompany him to Columbus, Indiana. Davis agreed to ride with Young, and thus began Young's and Davis's weekly trips to Columbus, which continued until their interdiction stop on January 8, 2010.

On these weekly trips, Young would hand Davis an amount of crack cocaine (typically one ounce) for Davis to hide in his underwear in order to avoid detection by law enforcement. Next, the two men would drive to either an apartment or a parking lot in Columbus. Davis would then hand the crack cocaine back to Young upon arrival, and Young would deliver the crack to his customers and collect payment. These customers, according to Davis, included both Ernest French and Brooke Taggart. No. 11-2267 App. Dkt. 78-2, 39-47.

French, like Davis, also testified at trial for the prosecution. French indicated that from the spring of 2008 until January 2010, he purchased crack cocaine from Young during his trips to Columbus. With the exception of one ninety-day break, French bought one to two ounces of crack cocaine every week during this two-year period. On some occasions, Young advanced (that is, fronted) the cocaine to French without payment. French corroborated that Davis was with Young for some of the trips but indicated that another per-

son rode along instead of Davis on some occasions. No. 11-2267 App. Dkt. 78-3, 148-51.

In Taggart's testimony for the prosecution, she too corroborated that Young made regular trips to Columbus with someone else in order to sell crack cocaine (although Taggart could only identify the person accompanying Young on these trips as "Fats"). Taggart began transacting with Young in June 2010 as a matter of convenience; since Young came to her in Columbus, she no longer had to drive to Indianapolis to obtain crack cocaine. Taggart testified that she typically purchased a quarter-ounce to a half-ounce of crack cocaine from Young twice per week using cash; she then resold the crack cocaine to someone else. No. 11-2267 App. Dkt. 78-2, 78-81.

### C. Evidence Relevant to Jones

The wiretap of Mockabee's phone also provided damaging evidence against appellant Jones. Specifically, this wiretap revealed six transactions in which Mockabee sold distribution quantities of crack cocaine to Jones. In the telephone conversations replayed at trial, Jones was overheard on November 25, 2009, telling Mockabee, "I was trying to see what the address was," and later in the conversation, asking Mockabee for "one." Once again, Detective Clark and Devon Hudgins interpreted these statements to signify that Jones had been trying to determine the amount of crack cocaine that his customer wanted, and eventually decided that he required one ounce of cocaine from Mockabee.

Similarly, Jones was overheard on November 27, 2009, telling Mockabee, "I'm going to slide down there in a minute," and "It's all the same." Detective Clark interpreted

these statements to mean that Jones intended to purchase the same one-ounce quantity of cocaine from Mockabee that he had purchased only two days before. No. 11-2267 App. Dkt. 78-2, 118-20.

On December 2, 2009, Jones and Mockabee spoke again. In this conversation, Mockabee told Jones, "I got [to] fill that up for you man," and "I had just got through taking the apron off." Jones responded that he had "jumped up" and needed Mockabee to "give [him] the sing and a half." Detective Clark believed that Jones was conveying to Mockabee that he wanted more cocaine than he had in his previous orders—one and a half ounces. At the same time, Mockabee was conveying to Jones that he was "getting the order together of crack cocaine" by "cooking" powder cocaine. No. 11-2267 App. Dkt. 78-2, 132-33.

The next conversation between Mockabee and Jones introduced into evidence at trial came from five days later, on December 7, 2009, during which Mockabee asked Jones, "What's the address?" and Jones responded, "Same." Like all of the other address conversations, Detective Clark believed that Mockabee's inquiry was about the amount of cocaine desired. Jones's response, according to Clark, signified that he desired one ounce of crack cocaine. *Id.* at 141-42. Another conversation from December 11 was then played at trial, in which Mockabee again asked Jones for "the address," and Jones responded "two" plus "some chez." Clark testified that here, Jones was ordering two ounces of crack cocaine plus some marijuana from Mockabee. *Id.* at 149-50. The final conversation between Mockabee and Jones played at trial came from January 4, 2010, when Mockabee advised Jones that he was "back up running." Clark believed this call

signified that Mockabee "had obtained cocaine and was ready to sell" it to Jones. No. 11-2267 App. Dkt. 78-3, 38-39.

In addition to these six wiretapped telephone conversations, the government introduced some physical evidence against Jones, most of which came from a house at 2713 Eagledale Drive in Indianapolis. Jones's phone calls to Mockabee were critical in linking Jones with the Eagledale address. In all of his conversations with Mockabee, Jones had used a cell phone with the number 317-333-4974. After hearing the six conversations between Jones and Mockabee in which the two men appeared to discuss cocaine transactions, Detective Clark obtained a court order allowing his IMPD/FBI team to use GPS technology to locate this cell phone. Clark's law enforcement team used the court order twice to locate the cell phone: first, on January 11, 2010, at 5:38 am, and second, on January 15, 2010, at 7:01 am. The team specifically chose these two particular times to locate the cell phone associated with Jones because "early morning hours[] are the time that an individual's most likely to be in their true residence, that most people sleep." Both times, the cell phone associated with Jones was traced to the 2713 Eagledale Drive address. No. 11-2267 App. Dkt. 78-6, 90-91. Moreover, on those same days, law enforcement observed a car registered to Jones parked in close proximity to the Eagledale address during the early morning hours.

Based on these car sightings, the intercepted calls, and the two supporting GPS locations of the cell phone used by Jones, the IMPD/FBI team obtained a search warrant for the Eagledale Drive address.[2] Law enforcement executed the

---

[2] On appeal, Jones contests only whether the supporting affidavit submitted by Detective Clark, which identified 2713 Eagledale Drive as

search warrant during the early morning hours of January 20, 2010. Gov't Appx. 3, 78.

While executing the search warrant, law enforcement discovered Jones inside the house at 2713 Eagledale Drive and arrested him there. In addition, law enforcement found a variety of incriminating items throughout the house, including (1) several pieces of crack cocaine on a towel, amounting to 36.6 grams, located on the kitchen countertop behind a marijuana plant; (2) 7.8 grams of crack cocaine in a Pyrex measuring cup, located on the kitchen counter next to a digital scale with suspected (but apparently untested) cocaine residue; (3) 1.3 grams of crack cocaine, also located on the kitchen counter next to some money and a couple of cell phones; (4) 47.6 grams of crack cocaine contained within a Pyrex mixing bowl and covered with rags, located by an entertainment center in the living room; (5) a loaded .22 caliber Ruger pistol, located behind the entertainment center in the living room; (6) 6.8 grams of crack cocaine, located next to suspected (but apparently untested) marijuana on a mattress in the middle of the living room floor; (7) a MAK-90 semi-automatic assault rifle, located on the floor of the master bedroom with "clothing and items of personal belongings scattered near and on or about it"; (8) a .22 caliber Ruger rifle, also located on the floor of the master bedroom but obscured from view because it was underneath some clothes; (9) a digital scale containing cocaine residue, located inside a shoebox in the second bedroom; (10) another digital scale, located inside a clear plastic tub (that also contained many

Jones's "residence," contained enough information to link Jones to the address, so we need not discuss any additional details of the eighty-four page affidavit.

other items) in the second bedroom; (11) the cell phone that Jones had used to call Mockabee (corresponding to telephone number 317-333-4974); and (12) a substantial stack of cash. No. 11-2267 App. Dkt. 78-6, 32-77. With all this evidence in mind, we turn now to Jones's particular claims of error with respect to the pretrial rulings. (Neither Drake nor Young alleges error with respect to pretrial motions).

## II. Pretrial Error Claims: Jones's Motion to Suppress

Before trial, Jones moved to suppress the evidence seized during the search of the residence at 2713 Eagledale Drive. The focus of his motion was whether Detective Clark's affidavit supporting the search warrant provided sufficient information to link Jones to the Eagledale. Without that link to him and his wiretapped drug conversations, Jones argues, the police had no basis to search the house. The affidavit claimed that 2713 Eagledale Drive was Jones's "residence"; the only support for this claim presented in the affidavit were the two early-morning GPS locations of Jones's cell phone and two early-morning sightings of Jones's car at that location. When reviewing the denial of a motion to suppress, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Glover*, --- F.3d ---, No. 2014 WL 2747124, at * 2 (7th Cir. June 18, 2014).

In his motion to suppress, Jones objected to the affidavit's identification of 2713 Eagledale Drive as his "residence." He pointed out that, first, nothing was presented to the magistrate judge issuing the search warrant about the ownership or rental of the house at 2713 Eagledale Drive. Second, nothing was presented linking the registration of Jones's car or cell phone to that address. Third, nothing was presented to suggest that Jones himself had been seen at or around that

address. Fourth, nothing was presented to indicate that a drug transaction had been initiated or had taken place at that address.

In spite of these four objections, the district judge concluded that there was probable cause to believe that 2713 Eagledale Drive was "if not Jones's only residence, at least one location at which Jones resided." Dkt. 643, 7. Emphasizing the fact that law enforcement both spotted his vehicle at the residence and located his cell phone during early-morning hours, the judge noted that:

> most people are not usually at their place of employment or engaged in social activity at such early hours. … The fact that Jones's vehicle and cell phone were within the residence at 2713 Eagledale Drive during those early morning hours is sufficient to support the common sense conclusion that the address was a location at which Jones resided during the relevant time period and would thus probably be a location where contraband would be stashed.

Dkt. 643, 7. Furthermore, the district judge determined that even if probable cause had not been present in the affidavit, the search was saved by the good-faith exception to the warrant requirement. *See United States v. Leon*, 468 U.S. 897, 922 (1984) (finding that a law enforcement officer's good faith, "objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion" of evidence). The district judge accordingly denied Jones's motion to suppress.

Like the district judge, we, too, believe that Detective Clark's affidavit contained sufficient information to support a finding of probable cause. Law enforcement officials have probable cause sufficient to support a search warrant when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). As the district judge correctly pointed out, the government's burden of proof under the probable cause standard is lower than it is at trial. *See Braun v. Baldwin*, 346 F.3d 761, 766 (7th Cir. 2003) ("Probable cause is not proof beyond a reasonable doubt, or even proof by a preponderance of evidence."). Compounding Jones's troubles is the fact that we "afford great deference to the decision of the judge issuing the warrant." *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010) *(*quoting *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009)) (internal quotation marks omitted). Under this deference, we must uphold the magistrate's decision here so long as there was "a substantial basis for concluding that a search would uncover evidence of a crime." *Glover*, 2014 WL 2747124, at *2.

A magistrate judge issuing a warrant "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009) (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). And "in the case of drug dealers, evidence is likely to be found where the dealers live." *Id.* (quoting *Lamon*). Jones does not contest these propositions. Nor does he contest whether there was probable cause to believe that he was a drug dealer. Instead, Jones challenges whether

the affidavit contained a substantial basis for concluding that he lived at 2713 Eagledale Drive.

Ideally, Detective Clark's affidavit might have supported its claim that 2713 Eagledale Drive was Jones's "residence" through house rental, house sale, utility or car registration records. (Notably, Jones's cell phone registration would not have helped law enforcement, since Jones's phone was registered to a different address at 2545 Brittany Road.) Still, even in the absence of such proof, the affidavit provided some evidence that Jones had a substantial connection to the Eagledale address. The observations of Jones's cell phone at, and his car in close proximity to, the address were sufficient to demonstrate a likelihood that Jones had spent the night there on at least two recent occasions.

Of course, the fact that an individual spends the night at a location on two occasions does not necessarily make that location the individual's residence. And law enforcement did have information, not presented to the magistrate judge, that 2713 Eagledale Drive might not have been Jones's only residence since his cell phone was registered to a different address at 2545 Brittany Road. Nonetheless, the fact remains that both times that law enforcement tried to locate Jones during the early morning hours, he appeared to be at the Eagledale address.

Given that law enforcement had some evidence suggesting that 2713 Eagledale Drive was one location (if not the only location) where Jones resided, the district court's decision was supported by substantial evidence. Probable cause exists if the supporting affidavit "allege[s] specific facts and circumstances to allow the judge to reasonably conclude that the items sought to be seized are associated with the crime

and located in the place indicated." *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002). Here, Detective Clark provided two observations of both Jones's cell phone and car to support the claim that 2713 Eagledale Drive was Jones's "residence." Perhaps law enforcement could have done more to connect Jones to the house on Eagledale Drive; however, they did enough to support a search warrant for the house.

Furthermore, even if Detective Clark's affidavit had not been sufficient to support a search warrant for the house under the probable cause standard, the search of 2713 Eagledale Drive would nonetheless be saved under *Leon*, 468 U.S. at 922. *Leon* and its progeny require us to treat Detective Clark's decision to obtain a search warrant "prima facie evidence that he was acting in good faith." *United States v. Garcia*, 528 F.3d 481, 487 (7th Cir. 2008). As a result, Jones can only defeat this good-faith exception by showing: "(1) that the issuing judge abandoned the detached and neutral judicial role; (2) that the officer was dishonest or reckless in preparing the affidavit; or (3) that the warrant was so lacking in probable cause that the officer could not reasonably rely on the judge's issuance of it." *United States v. Miller*, 673 F.3d 688, 693 (7th Cir. 2012).

Jones does not contest the issuing magistrate judge's neutrality; indeed, Jones seems to concede that the issuing judge made an understandable decision given the affidavit presented to him by Detective Clark. According to Jones's brief, the affidavit's use of the term "'residence'" to describe 2173 Eagledale Drive "is a highly meaningful assertion to any issuing magistrate" and "carries with it unique inferences that do not exist with other types of physical locations." Instead,

Jones attempts to defeat the good-faith exception by arguing that (1) Detective Clark was reckless in preparing the affidavit by labeling 2713 Eagledale Drive as Jones's "residence" and by failing to mention the 2545 Brittany Road address, and (2) law enforcement officers could not have reasonably relied on the magistrate judge's issuance of a search warrant as it was based on only two observations of Jones's car and cell phone at that location.

We agree with Jones that Detective Clark's affidavit could have been more complete. If the affidavit had mentioned that the cell phone was billed and the automobile was registered at 2545 Brittany Road, the magistrate judge could have weighed those facts against the early-morning GPS and car-sighting results. Given the limited information that Clark had about Jones's link to 2713 Eagledale Drive, it would have been more accurate to describe the Eagledale address as "a place where Jones appears to reside" or even "one of Jones's residences." Nevertheless, Detective Clark's affidavit need not be either airtight or flawless in order to hold up under the good-faith exception. Under our precedent, the presumption that law enforcement was acting in good faith by seeking a search warrant is so strong that we will uphold the presumption as long as there is "some indicia" of criminal activity on the property that can support a finding of probable cause. *Koerth*, 312 F.3d at 870.

For instance, although we found that the officer's affidavit in *Koerth* had failed to establish probable cause for issuing a warrant to search the defendant's "residence," we nonetheless refused to suppress the fruits of the search under the good-faith exception. *Id*. at 867–71. The affidavit in that case referenced a tip from a confidential informant indi-

cating that Koerth resided at the property to be searched and that illegal drug activity had previously occurred there. *Id*. at 870. We also did not believe that the judge issuing the search warrant had been misled by the affidavit. *Id*. at 871–72. As a result, we concluded that the affidavit "provided the type of facts that, if corroborated or explained in greater detail, might very well have been sufficient to establish probable cause," and upheld the district court's refusal to suppress the evidence recovered during the search. *Id*. at 870.

In the present case, the observations of Jones's cell phone and car at the Eagledale address during the early morning hours certainly provided some indicia that Jones was residing at that address. Moreover, these observations indicated that illegal drug activity was occurring on the property since the cell phone traced through GPS to the Eagledale address was the very same cell phone that Jones had used to make incriminating phone calls to Mockabee. Although Detective Clark's affidavit did not make clear whether 2713 Eagledale Drive was Jones's only "residence," as opposed to one of his several residences, at the very least it suggested that Jones was regularly and recently spending the night there. Consequently, we do not believe that Detective Clark's failure to mention that Jones may have had other residences besides 2713 Eagledale Drive was reckless.

Nor do we believe the magistrate judge issuing the search warrant was misled by Clark's failure to mention that Jones might have had other residences. Including the address to which Jones's cell phone was registered probably would not have changed the magistrate judge's determination that there was probable cause to search 2713 Eagledale because his car and cell phone were observed there on two

different occasions in the early morning hours. As the district court correctly pointed out: "Because of the fungible nature of cell phones, it is not at all uncommon for individuals to reside at an address other than that listed in their cell phone subscriber records." The observations of Jones's cell phone and car at the Eagledale address cited in the affidavit were more than sufficient for a law enforcement officer to reasonably rely upon when executing the warrant, and thus were more than sufficient to satisfy the good-faith exception. Accordingly, the district court did not err in denying Jones's motion to suppress.

### III. Trial Error Claims

### A.  Jones – Sufficiency of the Evidence

Because we agree with the district court that the evidence recovered from 2713 Eagledale Drive should not have been suppressed, we move now from Jones's pre-trial error claims to his trial error claims. As it turned out, the evidence recovered from the Eagledale residence was critical to the prosecution. The jury found Jones guilty of two crimes based upon items discovered in the Eagledale search—namely, possession of crack cocaine with the intent to distribute and being a convicted felon in possession of a firearm. The jury also found Jones guilty on the drug conspiracy charge, but the district court granted an oral Fed. R. Crim. P. 29 motion for judgment of acquittal on that charge after the verdict.

Jones contends that his Rule 29 motion should have been granted on the other two charges as well. According to Jones, the government failed to introduce sufficient evidence to prove that he possessed either the crack (Count Eleven) or the firearms (Count Twelve) recovered from the house at

2713 Eagledale Drive. He also challenges whether the government proved that he possessed the crack with intent to distribute. "A defendant challenging the sufficiency of the evidence supporting a jury's verdict bears a 'heavy burden.'" *United States v. Griffin*, 684 F.3d 691, 694 (7th Cir. 2012) (quoting *United States v. Olson*, 978 F.2d 1472, 1478 (7th Cir. 1992)). He "must show that no rational trier of fact could have found that the government proved the essential elements of the crime beyond a reasonable doubt." *Id.* We view the evidence and draw all reasonable inferences "from the evidence in the light most favorable to the government." *Id.*

The essential elements of possession of a controlled substance with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) are that "the defendant knowingly or intentionally possessed a controlled substance with the intent to distribute it, while knowing that it was a controlled substance." *United States v. Carraway*, 612 F.3d 642, 645 (7th Cir. 2010). The essential elements of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1)) are that "(1) the defendant has a previous felony conviction, (2) the defendant possessed the firearm …, and (3) the firearm … had traveled in or affected interstate or foreign commerce." *Griffin*, 684 F.3d at 695.

With respect to both the drugs and the firearms, the possession proved could be actual or constructive, and sole or joint. Proof of the mere presence of Jones at the Eagledale residence would not be enough; proof of his possessory interest in the contraband would be necessary. Since both the drugs and the firearms attributed to Jones were recovered from the Eagledale residence, the success of Jones's Rule 29 motion claim hinges on the evidence presented by the gov-

ernment at trial regarding the fruits of the search there, so we have scoured the record carefully for details concerning that search.

When law enforcement arrived to execute the search warrant, there were two people inside the house: Jones and an unidentified female. 2713 Eagledale Drive is a ranch-style house containing three bedrooms, a living room, a dining room, and a kitchen. The house was, by all accounts and as well demonstrated by photos admitted into evidence, "a little messy," to say the least. No. 11-2267 App. Dkt. 78-6, 77. There was a mattress in the middle of the living room floor, not to mention an entire bedroom with "clothing and items of personal belongings scattered … about it." *Id.* And of course, there were three guns, three digital scales, a total of 100.1 grams of crack cocaine and Jones's cell phone, strewn, along with a hodge-podge of clothing and household items, throughout the kitchen, the living room, and the two bedrooms.

IMPD narcotics detective Mark Kunst testified at trial about where various items were found during the execution of the search warrant. Unfortunately, he was unable to provide information about where Jones and the female were in the residence at the moment of the police entry. But he did explain where the drugs and guns were found. The drugs were in plain sight in two rooms of the house. But the guns were not. The first gun was located in the living room behind the entertainment center, and Detective Kunst admitted on the stand that this gun was "not in view" and "you'd have to bend over to get it." No. 11-2267 App. Dkt. 78-6, 75. The other two guns were located in the master bedroom, apparently lying among the piles of clothing. The master bed-

room, according to Kunst's testimony, was quite messy, and one of the guns there was at least partially obscured by clothing and other personal belongings.

The government argues that it presented at least enough evidence to sustain a conviction on a theory of constructive possession. "Constructive possession is a legal fiction whereby a person is deemed to possess contraband even when he does not actually have immediate, physical control of the object." *Griffin*, 684 F.3d at 695 (citing *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009)). We apply the same test to determine constructive possession of the drugs and the gun. *Morris*, 576 F.3d at 666. "Constructive possession may be established by demonstrating that the defendant knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others. This required 'nexus' must connect the defendant to the contraband, separating true possessors from mere bystanders." *Griffin*, 684 F.3d at 695 (citation omitted). Where, as here, a defendant does not have "exclusive control" over the property where the contraband was found, "evidence that a defendant had a 'substantial connection' to the location where contraband was seized is sufficient to establish the nexus between that person and the [contraband]." *Id.* (alteration in original) (quoting *Morris*, 576 F.3d at 667).

"[M]ere proximity to contraband is not enough to establish a sufficient nexus to prove constructive possession." *Id.* at 696. Rather, "[p]roximity must be coupled with other evidence, including connection with an impermissible item, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise in order to sustain a guilty verdict." *United States v. Reed*, 744 F.3d

519, 526 (7th Cir. 2014) (citing *Griffin*, 684 F.3d at 696), *petition for cert. filed*, (U.S. June 9, 2014) (No. 13-10530). In cases where a defendant jointly occupies a residence, a defendant's "substantial connection" to the residence is insufficient to establish constructive possession of contraband in that residence. *Griffin*, 684 F.3d at 696–97. In such cases "proof of constructive possession of contraband in the residence requires the government to demonstrate a '*substantial connection*' between the defendant and the contraband itself, not just the residence." *Id.* at 697 (emphasis added).

We conclude that there was sufficient evidence for the jury to find that Jones had a substantial connection to both the Eagledale Drive address and the crack cocaine located there. The government introduced evidence that on two separate occasions, in the early morning hours of January 11 and 15—four days apart—Jones's cell phone was located at the Eagledale Drive address and his car was parked nearby. Thus Jones's cell phone and car were placed at the residence within five days of the January 20 search of the residence. And, as we know, when law enforcement searched the Eagledale Drive residence in the early morning on January 20, they found both Jones and his cell phone. Furthermore, although we do not know where inside the house the officers found Jones, we do know that more than half of the crack cocaine found there was out in the open in common areas—the kitchen and living room; it was not concealed away in a bedroom or closed container. One of the digital scales was found out in clear view on the kitchen countertop too. Thus, Jones had easy access to the crack cocaine and had the power to exercise dominion and control over it.

In addition, the government introduced evidence of the telephone arrangement of six transactions from late November 2009 through January 4, 2010, in which Jones sought distribution quantities of crack cocaine from Mockabee. The last of these transactions occurred about two weeks before the search and seizure at the Eagledale Drive residence. These recorded conversations provide evidence that close to the time leading up to the search, Jones repeatedly had been seeking to acquire the very type of contraband found at the residence—distribution quantities of crack cocaine. This evidence provides that "other factor" our case law demands: Jones's connection with and desire to possess crack cocaine.

We think the evidence at trial established Jones's substantial connection not only to the Eagledale Drive address but also to the quantities of crack cocaine found there— sufficient for the jury to conclude he was guilty of drug possession. That the woman who also was in the house when the officers arrived to search may also have had access to the crack is immaterial. As previously noted, possession may be joint. *United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir. 1995). Thus, the evidence was sufficient to prove that Jones possessed the crack cocaine.

The government also presented sufficient evidence of Jones's intent to distribute the cocaine. Evidence of a drug quantity inconsistent with personal use and evidence of drug paraphernalia associated with distribution, such as baggies or scales, raise a reasonable inference that the defendant possessed the drug with intent to distribute it. *See, e.g.*, *United States v. Irby*, 558 F.3d 651, 654 (7th Cir. 2009). Digital scales with cocaine residue were found in the residence. Detective Clark testified that 0.2 grams of crack co-

caine was a common dosage unit for crack cocaine, and more than 450 dosage units of crack cocaine were seized from the residence. And the crack and scale in the kitchen were found in sight of a substantial stack of currency, a typical feature of the lucrative, cash-based business of illegal drug trafficking. Thus, the evidence raises a reasonable inference that Jones possessed the cocaine with intent to distribute it.

Turning to the firearms found at the residence, we reach the same conclusion. The government argues that it has established a substantial connection between Jones and the .22 caliber Ruger pistol based on the proximity of the pistol to the crack cocaine found by the entertainment center in the living room. Detective Kunst testified that a Pyrex bowl containing the crack was "in the living room by the entertainment center" and the Ruger was found by reaching behind that center. Although not right next to each other, the drugs and that gun were in close proximity to each other.

Regarding all the firearms found in the house, the government argues that it established a substantial connection between Jones and these firearms with proof of motive. The government relies on the strong relationship between drug trafficking and the possession of firearms. We have remarked that "it is widely known that guns and drugs go hand in hand." *United States v. Gulley*, 722 F.3d 901, 908 (7th Cir. 2013). Similarly, we and countless experts have recognized that "guns are tools of the drug trade." *United States v. Vaughn*, 585 F.3d 1024, 1029 (7th Cir. 2009). And although we have also recognized that "the average juror is not well versed in the mechanics of the drug trade," *United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1043 (7th Cir. 2013), the government helped the jury draw that connection through the

testimony of one of its law enforcement witnesses. IMPD Detective Stephen Swarm testified without objection that, based on his training and experience, drug traffickers use firearms to protect themselves from robbery or from being arrested by the police. Trial Tr. vol. 5, 748–49. Such testimony comports with what courts have allowed "concerning the tools of the [drug] trade." *Ramirez-Fuentes*, 703 F.3d at 1043 (quoting *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001) (internal quotation marks omitted). The evidence of Jones's participation in drug trafficking provides the motive for his possession of all three firearms found in the residence and therefore establishes the substantial connection between Jones and the firearms.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to the government, the evidence was sufficient to allow a reasonable jury to find that Jones possessed crack cocaine with the intent to distribute it and that he possessed the firearms to protect that distribution objective. Therefore, Jones's sufficiency challenge to his convictions is unsuccessful.

## B. Drake

Drake raises several alleged trial errors. She argues that the district court erred in: 1) admitting opinion testimony of Detective Clark interpreting drug code language, 2) impermissibly restricting her cross-examination of Detective Clark, 3) denying her Rule 29 motion challenging the sufficiency of the evidence to sustain her conspiracy conviction, and 4) allowing prosecutorial misconduct during rebuttal argument. Drake also argues that the cumulative effect of these alleged errors denied her a fair trial.

In responding to the first argument, the government does not argue that Detective Clark testified only as a lay witness, which distinguishes the recent case of *United States v. Cheek*, 740 F.3d 440, 447 (7th Cir.), *cert. denied*, 134 S. Ct. 2152 (2014), where we held that an agent's "testimony about the drug code words and phrases used by [the defendant] and his co-conspirators" that was based on the agent's personal knowledge obtained from his case investigation was lay testimony. We therefore must review the district court's decision to admit Detective Clark's testimony under the Federal Rules of Evidence governing opinion testimony.

### 1.  Federal Rules of Evidence 702 and 704

At trial, Drake's counsel did not object to any of Detective Clark's expert opinion testimony about how to interpret certain words used in the recorded telephone conversations (although counsel did question Clark about how he arrived at some of his interpretations). Nor did Drake's counsel object to Clark being qualified as an expert. App. Dkt. 70-2, 100. Because neither Drake nor any other defendant objected to Detective Clark's expert testimony, the government was not alerted that it needed to provide the bases for Clark's opinions. Had there been an objection, the prosecutor could have examined Clark on his specialized knowledge, the bases of his expert opinions, and the principles and methods he used in forming his expert opinions, and we do not doubt that the prosecutor would have done so in this case. Consequently, we review the admission of his expert opinion testimony for plain error. *United States v. Collins*, 715 F.3d 1032, 1037 (7th Cir.), *cert. denied*, 134 S. Ct. 658 (2013). We will reverse the district court's admission of testimony only if the admission was "an 'error' that [wa]s 'plain' and that 'affect[ed] substan-

tial rights.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (quoting Fed. R. Crim. P. 52(b)). If the error was harmless, we will not reverse. *See United States v. York*, 572 F.3d 415, 429 (7th Cir. 2009).

"Expert testimony must be helpful to the jury to be admissible," and "a witness should not be allowed to put an 'expert gloss' on a conclusion that the jurors should draw themselves." *United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012). Detective Clark pointed out (shortly before being qualified as an expert witness) that although there is some "standard code" for drug transactions, "the majority of code language that drug traffickers use" is not "standardized." App. Dkt. 70-2, 98. According to Clark, the non-standardized code between drug traffickers generally arises from "someone's familiarity with another individual over time, repeated transactions." *Id.* As a task force officer experienced in the drug trade, Clark helped the jury interpret the standardized drug language used by the defendants. And as the lead agent on the case who had "listen[ed] to over 10,000" intercepted phone calls among the defendants, Clark's testimony helped the jury interpret the non-standardized drug language specific to these defendants.

We have condoned such testimony as helpful to the jury. In *United States v. Ceballos*, 302 F.3d 679, 687–88 (7th Cir. 2002), we found DEA agents' interpretations of the pronouns "it," "them," and "both" as referring to methamphetamine shipments "helpful to the jurors because [a]s a result of [the agents' expert] testimony, the jury was able to apply to the evidence alternative theories of which they ordinarily would not have been aware" (alteration in original) (internal quotation marks and citation omitted). In *York*, we concluded that

an FBI agent's expert testimony about the meaning of the words "six," "nine," "five dollar," and "fifty-five" within a conversation "would assist the jury" since the meaning of these words were otherwise ambiguous. 572 F.3d at 423. And in *Christian*, we found that an FBI agent's expert testimony about a defendant's arm movements helpful, explaining: "Although at first glance, expert testimony that Christian's arm movements were consistent with tossing an object may appear to be a matter of common sense, a more deliberate consideration of the testimony suggests otherwise. What might seem like innocuous conduct to an untrained jury, might, to the trained eye, be indicative of criminal activity." 673 F.3d at 711.

Drake also challenges whether Detective Clark's opinions were based on reliable principles and methods. Although not a model of expert analysis, there is no evidence that Clark used unreliable principles and methods. Throughout the expert portion of his testimony, Clark stated that he drew his conclusions from his "training and experience applied to this case, [and] listening to over 10,000 or so intercepts." App. Dkt. 70-3, 81. He also said that in "identifying and interpreting code language in this case," he "conduct[ed] some form of peer review … in the sense that [he] work[ed] closely with other detectives within [his] unit." If he had a "thought or a certain technique or operation" he wanted to try, it was "discussed, and people offer[ed] their opinions as well." App. Dkt. 70-2, 305-06. Clark's limited discussion of his principles and methods is sufficient under *York*, where we said:

> Experts need not establish that certain words
> have fixed meanings only in the narcotics

> world or in the particular conspiracy before
> they can interpret those words. Experts can de-
> termine, based on their expertise, that certain
> words have drug-related meanings within the
> context of a single conversation. In *Ceballos*, for
> example, agents interpreted the words "it,"
> "them," and "both" as referring to shipments
> of methamphetamine. 302 F.3d at 687. Those
> words certainly lack any "fixed meaning" in
> the narcotics world or elsewhere—"it" does
> not always mean meth. But in the context of
> that conversation, where the pronoun "it" had
> no antecedent, the agents, drawing on their
> expertise, had a reliable basis to conclude that
> those words referred to drugs. *Id.* at 687–88.

572 F.3d at 424. In addition, two interdiction stops were con-
ducted shortly after Mockabee, Drake, and Young had used
some of the coded language, and powder or crack cocaine
was seized each time. These interdictions tested Detective
Clark's theory as to the meaning of the coded language, and
the seizures lend support to his interpretations.

Yet Detective Clark repeatedly transitioned back and
forth between testifying as an expert and testifying as a fact
witness/lead case agent during his expert testimony. In *York*,
we explained:

> Seamlessly switching back-and-forth between
> expert and fact testimony does little to stem the
> risks associated with dual-role witnesses. Even
> more problematic was the way in which the
> government prefaced these questions: "Based

> on your experience of [sic] crack cocaine inves-
> tigations *and this investigation in particular … ."*

*Id.*; *see also United States v. Garrett*, No. 13-1182, 2014 WL
2883886, at *6–7 (7th Cir. June 26, 2014) (discussing the dan-
ger of allowing an investigating officer to testify as both an
expert and fact witness); *Cheek*, 740 F.3d at 447 (recognizing
"inherent dangers" with using one witness as both an expert
and lay witness). Although the prosecution was careful to
preface every question with "based upon your training and
experience," it seems that "experience" sometimes meant
experience with this particular case, not general experience
as a task force agent. For example, when asked on cross-
examination (during his expert testimony) how he came to
the conclusion that "one" meant "one ounce of cocaine,"
Clark attributed this interpretation to his experience "from
what [he] gathered through the investigation" as lead case
agent. App. Dkt. 70-3, 127. It was error to allow this transi-
tioning back and forth between expert and fact testimony.
*See York*, 572 F.3d at 426 (holding district court erred in ad-
mitting a witness's responses to the government's questions
about "six," "fifty-five," and "five dollar" where the appeals
court could not tell whether the witness's interpretations
were based on his expertise or a conversation with the in-
formant); *United States v. Moreland*, 703 F.3d 976, 983 (7th Cir.
2012) ("Telling the jury that a witness is both a lay witness
*and* an expert witness and will be alternating between the
two roles is potentially confusing—and unnecessary."), *cert.
denied*, 133 S. Ct. 2377 (2013).

To avoid errors from dual-role witness testimony, we
have explained that "[t]he lawyer examining the witness
need only ask him the basis for his answer to a question, and

the witness will then explain whether it was his investigation of the defendants' conspiracy or his general experience in decoding drug code." *Id.* at 983–84. But here the lawyers did not do a good job asking Detective Clark for the basis for his answer to each question. It is often unclear in the trial transcript whether the detective is basing his testimony on his experience as a general drug investigator or his experience with this particular case. The district court should not have admitted Detective Clark's dual-role witness testimony.

Nonetheless, the error in failing to distinguish between the expert testimony and lead-case-agent testimony is salvaged under our plain error standard of review. Under that standard, we will not reverse where an error is harmless. *See York*, 572 F.3d at 429. The error in admitting Clark's dual-role witness testimony was harmless as to Drake. The government had very strong evidence that Drake was part of the drug conspiracy since it had a recorded telephone conversation of her telling Mockabee that "my business is your business." This conversation is evidence that Drake had "'a stake in [Mockabee's] venture'" and that they had an agreement to further distribute drugs.[3] *See United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943)), *cert. denied*, 134 S. Ct. 1876 (2014). Moreover, Hudgins also testified about the meaning of code words such as "address," "ready," "shut down," and "putting my apron on," and his testimony was consistent with Detective Clark's interpretation of each word's meaning. Hudgins's testimony was not offered as expert or dual-

---

[3] Further discussion of the evidence against Drake follows in connection with her challenge to the sufficiency of the evidence.

role witness testimony. It provides evidence of the case-specific meaning of the code words used by members of Mockabee's cocaine-distribution organization. That testimony would have convinced the jury that Drake was involved in the conspiracy even if Detective Clark's expert testimony had been excluded.

Drake also argues that Detective Clark rendered inadmissible opinions as to her state of mind. Federal Rule of Evidence 704(b) prohibits an expert from testifying about the defendant's "mental state or condition that constitutes an element of the crime." "Although an expert may not testify or opine that the defendant actually possessed the requisite mental state, he may testify in general terms about facts or circumstances from which a jury might infer that the defendant intended to distribute drugs." *United States v. Winbush*, 580 F.3d 503, 512 (7th Cir. 2009). "An important factor in determining whether an expert violated Rule 704(b) is the degree to which the expert refers to the specific defendant's intent, and expert testimony is proper as long as it leaves for the jury the ultimate conclusion that the defendant intended to distribute controlled substances." *Id.* (citations omitted).

Although Detective Clark appears to have been simultaneously testifying as both an expert and a lead case agent, he never directly testified that Drake intentionally joined the drug conspiracy—which is all that our precedent prohibits. *See, e.g.*, *Collins*, 715 F.3d at 1038 (expert testimony properly admitted where officer's testimony was not based on "some special familiarity with the workings of [the defendant's] mind") (internal quotation marks omitted); *United States v. Are*, 590 F.3d 499, 513 (7th Cir. 2009) ("We affirmed the district court's decision to allow the expert testimony because

the officers testified that their opinions were based on their knowledge of 'common practices in the drug trade' and not on 'some special familiarity with the workings of [the defendant's] mind.'" (citations omitted); *United States v. Lipscomb*, 14 F.3d 1236, 1242 (7th Cir. 1994) (concluding there was no Rule 704(b) violation where an expert testified "that a certain pattern of conduct evinces a particular kind of criminal activity. On the contrary, such testimony is considered quite helpful in drug-trafficking cases."). Detective Clark did not render an opinion as to Drake's state of mind.

The district court erred under Rules 702 and 704 in admitting testimony by Detective Clark concerning the meaning of drug-related telephone conversations involving Drake. But the error was only with respect to the failure to adequately distinguish between Clark's dual-role as expert and lead case investigator, and this error was harmless as to Drake. And Detective Clark did leave the ultimate question of Drake's intent to the jury. We therefore will not overturn Drake's conviction on this ground.

### 2. Cross-Examination of Detective Clark

Drake makes two objections to the district court's limitation of her cross-examination of Detective Clark. First, she objects to restriction on the line of questioning about how Clark arrived at his interpretation of the word "one" to mean "one ounce of cocaine." She also objects to the district court's refusal to let her play recordings of additional intercepted telephone calls. "We review a trial court's limitation of cross examination for an abuse of discretion. … Nevertheless, if the court's ruling implicates the defendant's constitutional rights, we review it *de novo*." *United States v. Neely*, 980 F.2d 1074, 1080 (7th Cir. 1992).

With respect to the cross-examination of Detective Clark about his interpretation of the word "one," it appears from the trial transcript that Drake's counsel repeatedly asked Clark how he arrived at his interpretation. App. Dkt. 70-3, 123-128. To illustrate:

> Q. Elisha Drake says "Can you have one of those ready for me?" Your opinion is that "one of those" means crack cocaine, correct?
>
> A. One ounce of crack cocaine, yes.
>
> …
>
> Q. Now, the contextual—the code language and the vague language used that has meaning within the context and within the understanding between the speakers is based on their understanding, correct?
>
> A. I don't understand that question.
>
> Q. Okay. The language used, and the particular meaning of generic phrases or vague phrases or pronouns, their meaning specific to the call is based on the mutual understanding of the callers, of the parties speaking, correct?
>
> A. Yes.
>
> Q. So within that context, "one" could mean anything that the two of them have previously agreed or previously understood that "one" means?
>
> A. Between two people, yes, that's correct.
>
> Q. And, for instance, if Elisha Drake were in the habit of buying one-eighth and she stated to Ramone Mockabee "Can you have one of those ready for me,"

"one of those ready for me" could be whatever quantity she was in the habit of purchasing, correct?

A. Based on my training and experience in this case – as applied to this case, with all the information, I believe this means one ounce.

Q. And what information do you base that on?

App. Dkt. 70-3, 123–25. Drake's counsel did not clearly phrase his questions, and when he did not get the answer that he wanted from Clark, counsel simply asked the same question over again. Eventually, Detective Clark appeared to get somewhat frustrated and ended up reciting his history in law enforcement to the jury in an attempt to answer the question posed by Drake's counsel. At that point, the judge called the attorneys up to the bench to put an end to the "fishing expedition" by Drake's attorney. *Id.* at 128.

Contrary to the characterization of events in Drake's brief, it appears that the judge was actually trying to help Drake's attorney by cutting off his questioning. After calling the attorneys to the bench, the judge warned Drake's attorney, "I can't figure out exactly where you're headed, but it can't be serving your client's interest to have [Clark] rehearse all of his expertise and his involvement in this case. All you do when you ask these questions is buttress his testimony." *Id.* The questions posed by Drake's attorney seemed to lack direction, suggesting that counsel did not have a clear theory of defense.

Similarly, the judge's prohibition on Drake's attorney playing telephone calls during his cross-examination of Clark appears to be the result of a lack of focus and organization by counsel. Drake's attorney first claimed that he

wanted to play twelve phone calls to impeach Clark. Then he claimed that he "missp[oke]" and that he actually wanted to play twenty-five phone calls. App. Dkt. 70-3, 62. The attorney also admitted that there was no written transcript of these phone calls for the jury and that the court reporter "had such difficulty in understanding the slang and terminology used by the subject [in these phone calls] … that he was not able to get [the transcripts] done in time" (an admission that indicated that the jury would likely need a written transcript in order for the recordings to be meaningful). *Id.* at 61. Drake's attorney had not previously disclosed to the prosecution that he intended to use these phone calls at trial. And when asked by the judge why he suddenly wanted to introduce them, Drake's attorney could only make the general statement that he wanted to "rebut[] a statement made by the witness"—offering absolutely no specifics about the content of the phone calls. *Id.*

Despite the lack of specifics offered, the judge did not prohibit Drake's attorney from playing the telephone calls at the trial. Rather, the judge stated that she wanted transcripts of the calls before they were played for the jury because she "simply d[id]n't know what [Drake's attorney has] got in mind or what he's got in his recording." *Id.* at 66. The judge told Drake's attorney that until he could establish a proper foundation for playing the recorded phone calls during cross-examination (by giving more specifics about what was said in them), she would not let him play the phone calls. The judge then remarked that the phone calls might "have to come in on [Drake's] case-in-chief" instead of during cross-examination. *Id.* Under these circumstances, the district court's limitation of the cross-examination by Drake's attorney was reasonable.

The district court did not violate Drake's Sixth Amendment rights by limiting her cross-examination of Clark.

### 3.  Sufficiency of the Evidence of Conspiracy

Drake next argues that the district court erred in denying her Rule 29 motion because the evidence was insufficient to distinguish her involvement with the cocaine-distribution organization from that of a simple buyer-seller relationship. We review a denial of a Rule 29 motion *de novo*. *United States v. Mandel*, 647 F.3d 710, 717 (7th Cir. 2011). We consider whether there was sufficient evidence from which a rational jury could find Drake guilty beyond a reasonable doubt. *Id.*

Buyer-seller relationships "do *not* qualify as conspiracies. People in a buyer-seller relationship have not agreed to advance further distribution of drugs; people in conspiracies have." *United States v. Brown*, 726 F.3d 993, 1001 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1876 (2014); *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010) ("To support a conspiracy conviction, there must be sufficient evidence of an agreement to commit a crime *other than* the crime that consists of the sale itself.") (quotations and citations omitted). We recently provided a clear statement of our approach to distinguishing conspiracies from buyer-seller relationships. In determining whether there was a conspiracy, "we consider the totality of the circumstances." *Brown*, 726 F.3d at 1002. A reasonable jury can infer a conspiracy from evidence of a consignment relationship, or a relationship exhibiting three qualities: "multiple, large-quantity purchases, on credit." *Id.* Other characteristics that distinguish a conspiracy from a buyer-seller relationship include "an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the

other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities." *Id.* at 999 (quoting *Johnson*, 592 F.3d at 755–56).

It is true, as Drake claims, that the police did not search Drake's car or home, and Drake did not have drugs on her person at the time of arrest. Nonetheless, her recorded phone calls to Mockabee provide the government with very strong evidence that she was selling drugs, that Mockabee was her supplier, and that Drake and Mockabee had an agreement "to advance *further* distribution" of cocaine. *See Brown*, 726 F.3d at 1001 (emphasis added). The most damaging evidence against Drake includes her telephone conversation with Mockabee in which he told her that she was "slippin' in her pimpin.'" Later in the conversation, she told him that "you can talk to me about my business. You about the only one that can" because "my business is your business, just like yours is mine." Mockabee responded that she "needed to stop that shit." This conversation provides clear evidence—even to a layman—that Mockabee and Drake were in the drug distribution business together. It also is evidence of Mockabee advising Drake on how to conduct her business. Moreover, in this conversation Mockabee appears to be warning her of a future threat.

Another piece of damaging evidence was Drake's phone call to Lonnie Belmar (who apparently owned the house in which Mockabee was cooking crack cocaine) to warn him that the police were a block away from his house. She warned Belmar that the police "ha[d] somebody stretched out in the alley, so I want y'all to be careful when you head to the hood." Later in the conversation, Drake talked about

warning Mockabee about the police presence as well. App. Dkt. 70-2, 152. This conversation provides clear evidence of Drake warning Belmar and agreeing to warn Mockabee of future threats posed by law enforcement. During this conversation, Drake also mentioned that she "had one of [her] stings call." While testifying as an expert, Detective Clark testified that "sting" was "common code language" for a cocaine customer (in other words, "sting" was a drug term used by others in addition to these particular defendants. App. Dkt. 70-2, 152-53. Devon Hudgins had also testified earlier that a "sting" was a "low level crack smoker." App. Dkt. 70-1, 99. Once again, this recorded conversation provides evidence that Drake was more than just a mere buyer and seller of crack cocaine; she was a member of Mockabee's drug distribution conspiracy.

Furthermore, the government introduced evidence that Drake and Mockabee engaged in nine cocaine transactions from late November 2009 to early January 2010, and that at least several of these transactions involved one ounce of crack cocaine—distributor quantities. Although the government had no evidence that Drake purchased cocaine from Mockabee on credit and its evidence against Drake is entirely circumstantial, the cumulative evidence—multiple, large-quantity purchases, Mockabee's advice to Drake about her distribution efforts, and Drake's warning to Belmar and agreement to warn Mockabee of law enforcement activity that threatened their drug distribution in the area—all raise a reasonable inference that Drake and Mockabee were in a conspiracy rather than a buyer-seller relationship. *See Brown*, 726 F.3d at 1002. Considering that the district court was required to "examine the evidence in the light most favorable to the government" when evaluating Drake's Rule 29 mo-

tion, *Mandel*, 647 F.3d at 717, the court did not err in finding sufficient evidence from which a rational jury could find Drake guilty beyond a reasonable doubt of the charged conspiracy.

### 4.  Prosecutor's Conduct During Closing Arguments

Drake points to several instances of alleged prosecutorial misconduct during closing arguments, which she contends denied her a fair trial. Where Drake objected to the prosecutor's remark, we review the district court's decision to overrule her objection for an abuse of discretion. *United States v. Philpot*, 733 F.3d 734, 745 (7th Cir. 2013). Where Drake did not object, we review the district court's decision to allow the remarks for plain error. *United States v. Graham*, 315 F.3d 777, 782 (7th Cir. 2003). Under this standard, Drake is entitled to a new trial only if she "can demonstrate an error that is plain, that affects [her] substantial rights, and that seriously affects the fairness, integrity or public reputation of the judicial proceeding, effectuating a miscarriage of justice." *United States v. Iacona*, 728 F.3d 694, 699 (7th Cir. 2013) (citations omitted).

We evaluate claims of prosecutorial misconduct using a two-part inquiry. *Id.* at 698–99. "First, we determine whether the challenged conduct was improper, and second, we evaluate the conduct in light of the trial as a whole to decide if it deprived the defendant of a fair trial." *Id.* at 699. That evaluation is guided by consideration of "the nature and seriousness of the remarks, whether the remarks were invited by the defense, whether the remarks could be rebutted by defense counsel, whether the district court provided a curative instruction, and the weight of the evidence against the defendant." *United States v. Lathrop*, 634 F.3d 931, 940 (7th Cir.

2011) (citation omitted). We have recognized that "improper statements made during closing argument are rarely reversible error." *Philpot*, 733 F.3d at 745–46 (quotation and citation omitted).

First, Drake challenges the prosecutor's remark in his rebuttal argument that Belmar's house had no heat. The prosecutor argued:

> And this business about going to Lonnie Belmar's house for social purposes? Mr. Ansell says look at Seron Poole. You can believe everything he has to say because his only incentive is to tell the truth. Yeah? What did he say about Lonnie Belmar's house. "In the winter, we didn't go there for social purposes to hang out. We didn't go there because there is no heat in the house."

Drake asserts that Poole never said that the house lacked heat during his testimony and that this mischaracterization of Poole's testimony "pierced the heart of her defense." Drake objected to the prosecutor's statement that Poole testified there was no heat in the house, and the judge responded: "Overruled. The jury will rely on its own recollections of the evidence in any event, but that objection may not be well taken. So I'll overrule it."

Drake is correct that Poole never testified that Belmar's house at 736 West 25th Street lacked heat and there was no other evidence that the house was without heat. The prosecutor misstated the evidence. In fact, Poole testified:

> Q. So in the winter time, people would drink alcohol and smoke marijuana socially at Lonnie Belmar's house?
>
> A. Yeah.

App. Dkt. 84-1, 61. Poole said the opposite of what the prosecutor claimed he had said; Poole testified that he *did* socialize at 736 West 25th Street during the winter. Thus the district court erred in overruling Drake's objection to the prosecutor's misstatement of Poole's testimony.

However, we find that the court's error did not negatively impact the fairness of Drake's trial. *See Iacona*, 728 F.3d at 699. The district court instructed the jury that the "arguments of counsel are not evidence." In addition, when the judge overruled counsel's objection to the prosecutor's misstatement of Poole's testimony, she instructed the jury that it should "rely on its own recollection of the evidence." "Jurors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot be reasonably expected to put it out of their minds." *United States v. Tucker*, 714 F.3d 1006, 1014 (7th Cir. 2013). Drake has given us no reason to think that the jury could not follow the court's instruction that arguments of counsel are not evidence. Nor has she given us a reason to think that the jury would not rely on its own recollection of the evidence and put the prosecutor's misstatement about Poole's testimony out of their minds. Furthermore, given the strength of government's evidence against Drake from the wiretapped phone conversations—and the fact that the prosecutor only made this comment about the lack of heat once—we do not believe that this inappropriate remark deprived Drake of a fair trial.

Next, Drake disputes a number of other prosecutorial statements, but these concerns were not raised at trial. She complains that the prosecutor referred to Lonnie Belmar's house as a "crack house"; she argues that there was no evidence to support that characterization. Drake also objects to the prosecutor's statement that Devon Hudgins's mother died of a crack overdose and submits that the prosecutor improperly attacked Drake's character "by linking her supposed disregard for the welfare of others" to Hudgins's mother's death. The prosecutor argued:

> Elisha Drake's a predator. She talks about stings, and we know what stings are. Devon Hudgins told [you] what … a sting was. His mama was a sting, and she died of a crack overdose. … [T]o Devon Hudgins, that's personal. That's what a sting is. To Elisha Drake, that's business. She's a predator.

Finally, Drake argues that the prosecutor grossly mischaracterized her defense arguments, thereby inflaming and prejudicing the jury against her. Because Drake did not object at trial to any of these remarks, we review the district court's decision to allow these statements for plain error. *Graham*, 315 F.3d at 782. We now take her objections in turn.

The prosecutor's characterization of Belmar's house at 736 West 25th Street as a "crack house" during closing arguments was proper. The prosecutor had repeatedly referred to the house in question as a "crack house" when questioning Detective Clark, and Drake's counsel never objected to this characterization during Clark's testimony. App. Dkt. 70-2, 323, 358, 429. Even Drake's own counsel referred to the crack house in questioning Detective Clark:

Q. During your investigation, you identified 781 West 25th Street as Ramone Mockabee's crack house; is that right?

A. Yes.

Q. Did he live at that residence?

A. No.

*Id.* at 515. More importantly, Clark's testimony substantiates the prosecutor's statements that Belmar's house was a "crack house." Thus the prosecutor's characterization of the house as a "crack house" was appropriate.

Drake also is correct that Hudgins never testified that his mother died of a crack cocaine overdose. With respect to his mother, Hudgins testified that he heard someone call his mother a "sting" one day and that a "sting" was someone who "smoked crack cocaine." App. Dkt. 70-1, 137. He also testified that his father was a heroin addict and that when he was about four years of age, he witnessed his mother kill his father with a knife. App. Dkt. 70-1, 86-87. Once again, the prosecutor mischaracterized trial testimony. We expect greater precision and care by government lawyers. But Drake cannot show that she was prejudiced by this remark such that her trial was unfair. The misstatement did not concern an important fact.

Nor can Drake show that the other remarks deprived her of a fair trial. Although the jury did not hear evidence that Hudgins's mother had died from a crack overdose, it heard that she was a crack addict who killed Hudgins's father in front of him when he was only four years old. Consequently, the jury had evidence that the damaging effects of crack cocaine abuse were "personal" to Hudgins. And while calling

Drake a "predator" may have been harsh, "so long as the evidence supports the comments, prosecutors may speak harshly about the actions and conduct of the accused." *United States v. Turner*, 651 F.3d 743, 752 (7th Cir. 2011) (quoting *United States v. Durham*, 211 F.3d 437, 440 (7th Cir. 2000) (concluding that prosecutor's reference to defendant "as a 'slick little dope dealer' who 'uses kids and exploits them to peddle poison'" and reference to defendant's brother as a "dope dealer" and a "liar" were not improper)). And Drake did refer to her customers as "stings," which may raise a reasonable inference that she had little regard for them and their welfare. Furthermore, the weight of the government's case against Drake negates any concern that these remarks denied her a fair trial.

Lastly, in rebuttal the prosecutor described the defense's central argument as follows: "[The defense would] like you to think that there's only a social relationship between Elisha Drake and Ramone Mockabee," Gov't's Supplemental App. 108, but (we are paraphrasing here), if you don't believe that and think there is a drug relationship, then it was a buyer-seller relationship; if you believe it is a seller-seller relationship, then it involved marijuana; and if you think it involved crack cocaine, "[the defense wants] you to believe that [Drake is] sweet and vulnerable," *id.* These remarks were not a gross mischaracterization of Drake's defense, which evolved throughout trial. The remarks were directed at the weakness of her defense; they were not improper. *See United States v. Washington*, 417 F.3d 780, 787 (7th Cir. 2005) (noting that the prosecutor's arguments "largely focused on the lameness of the defense rather than the defense counsel personally" were not improper); *United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001) (noting that "it was proper for the

prosecutor to comment on the lameness of the defendant's case"). Even if these remarks were improper, Drake has not shown that they prejudiced her, particularly given the substantial evidence of her guilt presented at trial.

### 5. Cumulative Error

Drake's final argument is that even if the alleged errors in isolation were harmless, their cumulative effect denied her the constitutional right to a fair trial. To succeed on a cumulative error theory, she must show that (1) two or more errors occurred at trial, and (2) "when considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Tucker*, 714 F.3d at 1017 (quotation and citation omitted). Even though Drake has shown that some errors occurred at trial, none were severe enough, even considered cumulatively, to have affected the jury's verdict given the overwhelming evidence against her.

### C. Young - Sufficiency of the Evidence

Young argues on appeal that the district court erred in denying his motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure because the government did not prove beyond a reasonable doubt that he participated in the conspiracy. In other words, he argues that the government failed to prove that he "agreed with any conspirator to commit a crime beyond the crime of engaging in a drug transaction." On appeal, Young submits that "the government proved only a buyer-seller relationship between himself and Ramone Mockabee, and … the government's proof regarding Gary Davis established only that he acted as an aider and abettor to Young's drug transactions." He also

claims that the evidence showed only that he and Belmar "discussed converting powder into crack cocaine, but did not discuss engaging in any drug transactions or agreeing to commit any crime."

The government responds that Young waived the right to challenge the sufficiency of the evidence based upon a buyer-seller argument. "Although a motion for judgment of acquittal need not spell out the particular basis for the challenge to the sufficiency of the evidence, when such a motion raises specific arguments, any claims not presented in the motion are waived." *United States v. Moore*, 363 F.3d 631, 637 (7th Cir. 2004). In making his Rule 29 motion at trial, Young's counsel specifically argued that "there is an absence of evidence in regard to any connection or nexus with Mr. Young and any of the co-conspirators as it relates to carrying out any type of agreement."

As we know, "[a] drug sale is itself an agreement: a buyer and seller come together, agree on terms, and exchange money or commodities at the settled rate." *Brown*, 726 F.3d at 998. However, a conspiracy "is the extra act of *agreeing* to commit a crime." *Id.* at 997. A "conspiracy to traffic drugs requires an agreement to advance *further* distribution." *Id.* at 998. While Young has refined his arguments on appeal, as we might expect a defendant to do, his challenge to the sufficiency of the evidence as to conspiracy at trial encompassed his finer-tuned argument that the government proved merely that he had a buyer-seller relationship with Mockabee. In essence, Young argued that the government failed to prove that he agreed to further distribute drugs. We find no waiver here.

Moreover, the government presented sufficient evidence to establish that Young conspired to distribute crack cocaine. To convict him of conspiracy, the government had to prove that "(1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined the agreement." *Johnson*, 592 F.3d at 754. The government need not prove the specific individuals with whom Young conspired. *See, e.g.*, *United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009). The indictment charged that Young and his nineteen co-defendants "knowingly conspir[ed] *together and with diverse other persons*, known and unknown to the Grand Jury, to distribute controlled substances." Young Dkt. 177, 2 (emphasis added). Although the indictment alleged that Young "distributed powder cocaine for Mockabee," most of the evidence that the government presented against Young at trial focused on Young's interactions with Gary Davis (one of the original twenty defendants) and Earnest French (not one of the original twenty defendants).

Young admits in his reply brief that "a rational jury could find that he conspired with French to distribute crack cocaine." Young seems to think that he cannot be convicted of conspiracy if all that the government can prove is his conspiracy with French. He argues that his conspiracy with French "is not the crime for which [he] was charged in the superseding indictment." This argument ignores the plain language of the indictment, which alleges that Young conspired "with diverse other persons" to distribute crack cocaine. The government only needed to prove that Young engaged in a conspiracy with one other person (not every person identified in the indictment) in order for a jury to convict him.

And we reject Young's argument that proof of a conspiracy based on the transactions with French would amount to a fatal variance between the conspiracy alleged in the indictment and the government's proof at trial. This claim, which was first asserted in Young's reply brief on appeal, was raised far too late and was therefore waived. *See, e.g.*, *United States v. Kennedy*, 726 F.3d 968, 974 n.3 (7th Cir. 2013). Even if the claim was not waived, however, it still fails. A conspiracy variance claim is treated as a sufficiency of the evidence claim. *United States v. Stevenson*, 656 F.3d 747, 752 (7th Cir. 2011). To overturn his conspiracy conviction because of a variance, Young would have to show from the evidence "both that he did not conspire with each defendant *and* that he was prejudiced by being tried with defendants who were not his coconspirators." *Id.* at 753 (quoting *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991)). But he has failed to demonstrate that he did not conspire with each defendant. As shown below, there was sufficient evidence that he conspired with codefendant Davis; thus we do not reach the prejudice prong. Besides, evidence that Young conspired with French to distribute crack cocaine fits well within the larger conspiracy charged in the indictment.

The government presented evidence that Young was on the same side of drug transactions as Davis, and thus engaged in a conspiracy to distribute crack with him. "There is sufficient evidence to establish a conspiracy … where the jury finds credible a government witness who shows that the alleged coconspirators were 'on the same side of the transaction.'" *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006) (quoting *United States v. Smith*, 393 F.3d 717, 720 (7th Cir. 2004)); *see also United States v. Rea*, 621 F.3d 595, 608 (7th Cir. 2010) ("[W]e have held that a conspiracy exists when the

defendant and a co-conspirator were on the 'same side of the transaction.'" (quoting *Johnson*, 437 F.3d at 675).

Davis testified at trial that he had made many car trips with Young from Indianapolis to Columbus, Indiana between October 2008 and January 2010. Davis stated that he and Young took these trips as often as "once a week." App. Dkt. 70-2, 40. On these trips, Davis agreed to carry crack for Young on his person—most often in his underwear, and in exchange, Young compensated Davis with "enough [crack] to smoke." *Id.* Upon arrival in Columbus, Davis would give the cocaine back to Young, and Young would get out of the car and meet either a man named "Frenchy" or a woman named "Brook." *Id.* at 44-50. (These names obviously correspond to the aforementioned government witness Earnest French and Brooke Taggart.) After his meetings with "Frenchy" and "Brook," Young would return with a "wad of money." *Id.* at 46. Assuming that the jury found Davis's testimony credible—and we must do so at this stage if at all reasonably possible, *see Brown*, 726 F.3d at 1005—Davis's testimony presents clear evidence that Young was on the same side of a drug transaction with his co-defendant. And Davis's testimony was corroborated by the January 8, 2010 interdiction stop of Young and Davis, during which officers recovered about one ounce of cocaine from Davis's underwear. Therefore, we find sufficient evidence that Young conspired with Davis to distribute crack cocaine.

Moreover, the government has evidence from Young's conversation with Belmar that Young took part in a conspiracy to distribute crack with both Belmar (an original co-defendant) and another unnamed party. At trial, the government presented a recorded conversation of Young appar-

ently asking Belmar for advice about how to cook some troublesome powder cocaine into crack. Young said that he had a "person" who "owe[d]" him and "ha[d] some software, [but] it won't get hard when you cook it." App. Dkt. 78-2, 144-45, 147. In response, Belmar advised Young to "melt it down," "pour the water off," "throw soda on it," and "keep stirring it up." *Id.* at 145. This conversation presents evidence that Belmar was advising Young on his business, which is one of the factors used to distinguish a conspiracy to distribute drugs from a mere buyer-seller relationship. *See, e.g., Johnson*, 592 F.3d at 756. The conversation also presents evidence that Young had sold drugs on credit to another unnamed party. According to Detective Clark's testimony, Young's statement that his "person" with the troublesome powder cocaine "owe[d]" him indicated that Young had previously given that person cocaine "on consignment," and that that person owed Young "money on the back end." App. Dkt. 78-2, 148. Sale on credit or consignment is another one of the factors used to distinguish a conspiracy to distribute drugs from a mere buyer-seller relationship. *Id.*

Accordingly, we conclude that the government presented sufficient evidence that Young conspired to distribute controlled substances, and the district court did not err in denying Young's motion for judgment of acquittal.

### IV. Post-Trial Error Claims

Although we affirm the convictions of Jones, Drake and Young, for the reasons explained below we must vacate the sentences of Jones, Mockabee, and Drake, and remand their cases for further proceedings.

### A.  Jones – Fair Sentencing Act

Following his conviction, the district court sentenced Jones to life on Count Eleven and 120 months on Count Twelve, to be served concurrently. Jones maintains that the district court's denial of his request to be sentenced under the Fair Sentencing Act of 2010 (FSA), 124 Stat 2372, was error because the Act applied to him at the time of sentencing. *See United States v. Dorsey*, 132 S. Ct. 2321, 2331 (2012) (holding that the FSA's more lenient penalties apply to defendants who committed their crimes before the Act's effective date but were sentenced after that date). The government has admitted error. We agree that the court erred and will vacate Jones's sentence and remand for resentencing consistent with *Dorsey* and the FSA.

### B.  Mockabee

Mockabee pleaded guilty to Count One of the superseding indictment, charging him with the cocaine conspiracy in violation of 21 U.S.C. § 846; Count Seven, charging him with possession with intent to distribute five grams or more of cocaine in violation of § 841(a)(1); and Count Eight, charging him with possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 360 months' imprisonment on each count, to be served concurrently. He challenges his sentence on two grounds.

#### 1.  *Ex Post Facto* Clause

Mockabee first argues that his sentence violates the *Ex Post Facto* Clause because the district court sentenced him under the version of the guidelines in effect at the time of sentencing—the 2010 version was in effect when he was sentenced on May 27, 2011—rather than the 2009 version in ef-

fect at the time of the offense, which was complete by January 20, 2010. The 2010 version contained three adjustments that were applied to Mockabee at sentencing: the credible threat of violence adjustment in U.S.S.G. § 2D1.1(b)(2), the crack house adjustment in U.S.S.G. § 2D1.1(b)(12), and the criminal livelihood adjustment in U.S.S.G. § 2D1.1(b)(14)(E). These adjustments were added to the guidelines after the charged conspiracy had ended.

The government opposed Mockabee's *ex post facto* argument in its brief and at sentencing, relying on our decision in *United States v. Demaree*, 459 F.3d 791, 795–96 (7th Cir. 2006), in which we held that applying the version of the guidelines in effect at the time of sentencing does not violate the *Ex Post Facto* Clause, even if that version took effect after the defendant committed the offense and even if the version increased the sentencing range. Since then the Supreme Court decided *Peugh v. United States*, 133 S. Ct. 2072 (2012), overruling *Demaree* and holding that the *Ex Post Facto* Clause is violated "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." *Id.* at 2078. Because Mockabee was sentenced under a more recent version of the sentencing guidelines, which provides for a higher guideline range than the guidelines in effect at the time of his offense, he must be resentenced.

## 2. Aggravating Role in the Offense

The second issue Mockabee raises is whether the district court erred in applying a four-level sentence enhancement under U.S.S.G. § 3B1.1(a) based on a finding that he "was a leader or organizer of criminal activity that involved five or

more participants or was otherwise extensive." Application of this increase along with the other increases unchallenged on appeal, less a reduction for acceptance of responsibility brought Mockabee's total offense level to 43. This combined with his criminal history category of II yielded a sentencing guideline range of life imprisonment. To the extent that Mockabee challenges the district court's factual determination that he exercised a leadership role in the charged offense, we review for clear error. *United States v. Rosen*, 726 F.3d 1017, 1024 (7th Cir. 2013). We review the district court's interpretation and application of the guidelines *de novo*. *United States v. Walsh*, 723 F.3d 802, 807 (7th Cir. 2013).

Mockabee does not challenge that the offense involved five or more participants; he contests only whether he was an organizer or leader. He says that he does not challenge the district court's findings of fact as to his role, but he contests the court's conclusions from the facts and its application of the guideline to the facts. Mockabee maintains that, although he was a buyer and seller of drugs in a large-scale conspiracy, he did not have any "real or direct influence" over other members in the conspiracy.

At Mockabee's sentencing, Detective Clark testified that Mockabee decided which cocaine source would be approached when the conspiracy needed to resupply. Clark added that Mockabee contacted Poole, who introduced Mockabee to Luter, and eventually Mockabee decided to bypass Poole and purchase directly from Luter. Clark also testified that Mockabee decided to cook the powder cocaine purchased from his suppliers into crack cocaine and decided where to cook the crack (at 781 West 25th Street). He also chose his customers, set the prices for the crack, and decided

the quantities of crack to be distributed. And Mockabee determined which customers were admitted through the back door and which ones were allowed up into the kitchen at the crack house to purchase cocaine from him, and he decided that only one person would be allowed in at a time. In addition, according to Clark, Mockabee declined to sell to potential purchasers of small quantities, and instead referred them to Lonnie Belmar and Diomoni Small, and Mockabee told Belmar and Small to deal with those small-time customers.

The district court found that the evidence demonstrated that Mockabee's role was that of a leader or organizer, explaining that "in controlling his own behavior, he also controlled and managed and led major aspects of this criminal enterprise." Mockabee Sent. Tr. 62–63. The district court relied on the facts that Mockabee "located the sources of the cocaine and determined who to deal with in terms of not just his own acquisition of [cocaine], but in terms of supplying his considerable network of buyers and purchases in quantities, by the way, that they were acquiring that suggested clearly that they were distributing it themselves." The court also found that Mockabee was "the distribution point" for his network, that he decided when his customers would get the cocaine for distribution, how much cocaine they would get, and the price they would pay for it. *Id. at* 63. In addition, it found that Mockabee's network of participants involved at least five people who were involved in the conspiracy and that Mockabee oversaw their activities in the conspiracy and the distribution network. *Id.* at 63–64. And the court looked to the evidence that Mockabee recruited Poole as a source of supply for the cocaine, and then through Poole recruited Luter as a source. The fact that law enforcement seized twice as much money from Mockabee as from Luter, and much

more than anyone else, was also a basis for the court's finding.

"The 'central concern' of § 3B1.1 is the defendant's relative responsibility for the commission of the offense." *Rosen*, 726 F.3d at 1024 (quoting *United States v. Vasquez*, 673 F.3d 680, 685 (7th Cir. 2012)). In determining whether a defendant was an organizer or leader under 3B1.1(a), "we have held that courts may consider the factors outlined in Application Note 4 to § 3B1.1(c), including the degree of control and authority the defendant exercised over others." *United States v. Vaughn*, 722 F.3d 918, 935 (7th Cir.), *cert. denied*, 134 S. Ct. 541 (2013). Those factors are "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4. We have said that to justify a § 3B1.1(a) adjustment, "'the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.'" *Rosen*, 726 F.3d at 1025 (quoting *Vasquez*, 673 F.3d at 685).

As Mockabee argues, middleman status alone is not sufficient for purposes of § 3B1. *See United States v. Brown*, 944 F.2d 1377, 1382 (7th Cir. 1991). And it is also true that the fact that a defendant sets the price to be paid for the drugs by the conspiracy's members alone is not dispositive under the guideline. *United States v. Thompson*, 944 F.2d 1331, 1349 (7th Cir. 1991). But that is not the only fact that supports the find-

ing that Mockabee was an organizer or leader of the conspiracy.

Mockabee challenges the district court's reliance on the fact that more than twice as much money was seized from him than from Luter, yet Mockabee acknowledges that "the claimed right to a larger share of the fruits of the crime" is a factor to be considered in determining a defendant's role in the offense. *See* U.S.S.G. § 3B1.1 cmt. n.4. He argues that the district court "teases far too much from limited facts." Quarreling with the court's reasonable inference drawn from a fact does not establish clear error. *See United States v. Salem*, 657 F.3d 560, 563 (7th Cir. 2011) ("The district court may draw reasonable inferences from the record in making its factual findings at sentencing.").

We also reject Mockabee's argument that the controlling aspects of his conduct were simply examples of him directing his own behavior as a buyer and seller of cocaine. The district court was right: Mockabee controlled, managed, and led the major aspects of the cocaine distribution conspiracy. Mockabee was the center of the conspiracy. He ran the crack distribution center at the 25th Street residence, making key decisions as to supply, including when to cook the cocaine into crack and how much. He controlled access to the house, deciding who was admitted and when, who was allowed to conduct business with him and who was sent to deal with Small or Belmar. It was Mockabee who made the decision to allow only one purchaser into the house at time, further controlling others' access to the crack house and their access to the cocaine used for further distribution. And when he sent customers to Small or Belmar, Mockabee instructed Small and Belmar to deal with the customers, thus exercising au-

thority over all these underlings—the low-level cocaine customers, Small, and Belmar. Furthermore, Mockabee recruited Poole and then through Poole recruited Luter into the distribution network. The evidence supports the finding that Mockabee claimed a right to a larger share of the proceeds of the conspiracy. Moreover, there was evidence that Mockabee gave advice to Drake on how to run her part of the business, which further reveals his leadership role. Each of the factors listed in the application note to § 3B1.1 supports the conclusion that Mockabee held an organizational and leadership role in the conspiracy.

We find no clear error in the district court's determination that Mockabee was an organizer or leader of the conspiracy, and the court's application of the four-level adjustment under § 3B1.1(a) to the facts of Mockabee's case was appropriate.

## C. Drake

Drake brings two challenges to her sentence. She first argues that the district court erred in subjecting her to an enhanced mandatory minimum despite the absence of specific jury findings regarding the drug quantities involved in the conspiracy. Although Drake did not object at trial to the district court's instructions or verdict forms regarding drug quantities, the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), holds that any fact that increases the mandatory minimum is an element of the crime that must be submitted to the jury. Because the jury failed to make specific findings regarding drug quantities, which increased the mandatory minimum for her from five to ten years, *see* 21 U.S.C. § 841(b)(1), we must remand her case for resentencing.

Drake also argues that using her prior felony drug conviction to increase the mandatory minimum sentence violated her Fifth and Sixth Amendment rights because the conviction was not alleged in the indictment or proven to the jury. The Supreme Court in *Almendarez-Torres v. United States*, 523 U.S. 224, 239, 243–47 (1998), rejected the argument that a prior conviction triggering a mandatory minimum sentence is an element of an offense that must be proved to a jury beyond a reasonable doubt. *See United States v. Elliott*, 703 F.3d 378, 381 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2359 (2013). Although *Almendarez-Torres* has been widely criticized and is "vulnerable to being overruled," *id.* at 381 n.2, that is for the Supreme Court to decide, not us, *id.* The district court did not err by finding that Drake's prior felony drug conviction increased her mandatory minimum sentence.

## V. Conclusion

For the foregoing reasons, Jones's convictions on Count Eleven and Count Twelve are AFFIRMED, and his sentence is VACATED and REMANDED for resentencing consistent with *Dorsey*; Drake's conviction is AFFIRMED and her sentence is VACATED and REMANDED for resentencing consistent with *Alleyne*; Young's conviction is AFFIRMED; and Mockabee's sentence is VACATED and REMANDED for resentencing consistent with *Peugh*.