In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1951

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CORY L. GRIFFIN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:08-cr-00195-RTR-1—**Rudolph T. Randa**, *Judge.*

ARGUED MARCH 30, 2012—DECIDED JULY 5, 2012

Before BAUER, POSNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* A jury convicted Cory Griffin of intentional possession of a firearm and ammunition as a convicted felon in violation of 18 U.S.C. § 922(g)(1). On appeal, Griffin's principal argument is that the evidence presented at his trial was not sufficient to support his conviction because there was no evidence that he actually intended to exercise any control over his father's firearms in his parents' home where he was

living at the time. We agree and therefore reverse his conviction. Griffin was present in a home where firearms were present, but the government offered no evidence that would have allowed a reasonable jury to find beyond a reasonable doubt that he had constructive possession of the firearm and ammunition for which he was convicted by intending to exercise control over them.

I. *The Evidence Against Griffin*

Because we are reviewing a conviction for sufficiency of the evidence, we state the facts and review the evidence in the light most favorable to the government, giving it the benefit of conflicts in the evidence and reasonable inferences from the evidence. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). After defendant Cory Griffin was released from prison in April 2008 under court supervision, he moved into his parents' single-family home in Milwaukee. In preparation for that move, Griffin's probation officer, LaTasha Perry, contacted his father by telephone to learn whether it would be suitable for Griffin to move into his parents' home. Probation Officer Perry also met with Griffin himself and reviewed the rules for his community supervision, which he signed. Rule 12 reads: "You shall not purchase, possess, own or carry any firearm or any weapon unless you get approval in advance from your agent." Approximately two weeks after Griffin moved into his parents' home, Perry conducted a home visit, although she did not inspect the home for contraband because she was unaccompanied.

About a week after Perry's home visit, a police S.W.A.T. team executed a search warrant on the Griffin home looking for the defendant's brother Chauncy. The S.W.A.T. team did not find Chauncy, but they did find the defendant, as well as ten firearms and five sets of ammunition. The firearms and ammunition belonged to the defendant's father, Phil Griffin, an avid hunter, and to three of his friends who regularly hunted together. We must be specific about the firearms because the defendant was convicted of possessing only one shotgun and two sets of ammunition. The police found two revolvers behind the headboard of the bed of defendant's parents, two shotguns and a rifle in their closet, a shotgun behind the door in the kitchen that leads to the second floor, and four shotguns behind the kitchen refrigerator. Ammunition was found in the defendant's parents' nightstand, on the stairs between the first and second floors, in the basement on top of a pool table, and in the basement on top of a television. The police had previously determined that the defendant had a felony conviction, so they arrested him after they completed the search of his parents' home. The federal government charged Griffin with possession of all the firearms and ammunition recovered from his parents' home during the search.

Probation Officer Perry testified at the defendant's trial. The prosecution asked Perry what someone under her supervision should do if he discovers a gun in the place where he is living. Perry responded that the supervisee should contact his probation officer immediately so that the probation officer could find the super-

visee an alternate place to live. She also testified that during her conversation with Phil Griffin, the defendant's father, she told him that there could be no firearms in the home if the defendant lived there, and that Phil Griffin said he understood. She did not testify, however, that she had ever told defendant Cory Griffin the same thing. Father Phil Griffin in his testimony disputed Perry's account of their conversation, denying that she ever mentioned firearms. He acknowledged, however, that police had removed seven of the guns from the home in 2004 in connection with the defendant's legal troubles, and the defendant himself also testified that he knew that his father's guns had been removed from the home when he was arrested in 2004.

The government also called Mario Walker, who was in jail with Griffin while the felon-in-possession charge was pending. Walker testified that Griffin told him that the police had come into his parents' house and found ten guns — eight shotguns and two pistols, and that two of the firearms had been hidden in the back of an appliance. Walker further testified that the defendant told him that his father had purchased some of the shotguns for the defendant and that the two handguns belonged to the defendant and were hidden behind the stove.

The jury convicted Griffin. Because the felon-in-possession charge covered several firearms and sets of ammunition, the jurors were properly instructed that they would need to agree unanimously on Griffin's possession of one or more specific firearms or sets of ammuni-

tion to find him guilty. The jury found that Griffin had possessed only the shotgun found behind the kitchen door and two sets of ammunition found on the stairs between the first and second floors. The district court sentenced Griffin to 60 months in prison and three years of supervised release. Griffin has appealed.

II. *Discussion*

Griffin argues that the evidence was insufficient to support the jury's conclusion that he possessed the shotgun behind the kitchen door and the ammunition on the stairs of his parents' home. A defendant challenging the sufficiency of the evidence supporting a jury's verdict bears a "heavy burden." *United States v. Olson*, 978 F.2d 1472, 1478 (7th Cir. 1992). To prevail, Griffin must show that no rational trier of fact could have found that the government proved the essential elements of the crime beyond a reasonable doubt. See *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). Both the evidence and all of the reasonable inferences that can be drawn from it are viewed in the light most favorable to the government. *United States v. Garrett*, 903 F.2d 1105, 1109 (7th Cir. 1990).

To convict a defendant on a charge of possessing a firearm or ammunition after a previous felony conviction, the government must prove that (1) the defendant has a previous felony conviction, (2) the defendant possessed the firearm or ammunition, and (3) the firearm or ammunition had traveled in or affected interstate or foreign commerce. 18 U.S.C. § 922(g)(1); *United States v.*

*Harris*, 587 F.3d 861, 866 (7th Cir. 2009). Griffin stipulated to the first and third elements. He had a previous felony conviction, and all the firearms and ammunition had traveled in interstate commerce. The issue for trial was whether Griffin knowingly possessed any firearms or ammunition.

The government had no evidence that Griffin himself ever had actual physical possession of the shotgun behind the kitchen door or the ammunition on the stairs. There was no evidence of his fingerprints on those items, nor did any witnesses testify that they had seen Griffin holding or using them. Under the law, however, unlawful possession can also include only constructive possession. The government's theory at trial was that Griffin constructively possessed the guns and ammunition seized from his parents' house. See *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009) (explaining actual and constructive possession). Constructive possession is a legal fiction whereby a person is deemed to possess contraband even when he does not actually have immediate, physical control of the object. *Morris*, 576 F.3d at 666. Although constructive possession is a legal fiction, it can lead to real convictions and punishments. Constructive possession may be established by demonstrating that the defendant knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others. *Katz*, 582 F.3d at 752. This required "nexus" must connect the defendant to the contraband, separating true possessors from mere bystanders. See *Morris*, 576 F.3d at 666; *United States v. Quilling*, 261 F.3d 707, 712 (7th

Cir. 2001); *United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000); *United States v. Windom*, 19 F.3d 1190, 1200 (7th Cir. 1994).

In constructive possession cases, the necessary connection between the defendant and the contraband is typically shown in one of two ways. First, if the government demonstrates that the defendant had "exclusive control" over the property where the contraband was discovered, a jury may reasonably infer that he constructively possessed the items, including the contraband, found on that property. *United States v. Castillo*, 406 F.3d 806, 812 (7th Cir. 2005). Exclusive control over the premises allows the jury to infer the knowledge and intent to control objects within those premises, and accordingly we have held that constructive possession can be established by demonstrating that a firearm was seized at the defendant's residence. See *United States v. Pritchard*, 745 F.2d 1112, 1124 (7th Cir. 1984) ("The fact that the firearms in question were seized during a search of appellant's residence in an area over which he exercised dominion and control is sufficient evidence from which to infer that appellant constructively possessed those weapons."). Second, in the absence of exclusive control, "evidence that a defendant had a 'substantial connection' to the location where contraband was seized is sufficient to establish the nexus between that person and the [contraband]." *Morris*, 576 F.3d at 667.

The government argues that, even though Griffin did not have exclusive control of the residence, he had a "substantial connection" to it, and that constructive

possession has been found in similar circumstances. In essence, the government argues that residency alone is enough to connect the defendant to the guns even in a joint residence. Griffin argues that neither control over the surrounding areas nor proximity to and awareness of the contraband is sufficient by itself to sustain a guilty verdict. Rather, Griffin argues, we have looked for some sort of "plus factor" that ties the defendant to the contraband. In each of our cases finding constructive possession in the context of a joint residence, argues Griffin, the evidence reflected more than mere residency and knowledge that the contraband was present.

We have explained repeatedly that mere proximity to contraband is not enough to establish a sufficient nexus to prove constructive possession. See, *e.g.*, *Morris*, 576 F.3d at 666 ("Proximity to the item, presence on the property where the item is located, or association with a person in actual possession of the item, without more, is not enough to support a finding of constructive possession."); see also *United States v. Hampton*, 585 F.3d 1033, 1041 (7th Cir. 2009) ("[M]ere proximity to the object alone is not enough to prove knowledge of the item."). Rather, "proximity coupled with evidence of some other factor— including connection with [an impermissible item], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise is enough to sustain a guilty verdict." *Morris*, 576 F.3d at 668, quoting *United States v. Richardson*, 161 F.3d 728, 732 (D.C. Cir. 1998). In fact, "[e]ven when a defendant continues to have weapons in his home that he legally obtained before his felony convictions, he is

not guilty of violating 18 U.S.C. § 922(g)(1) without a showing that he exercised control over the firearms." *United States v. Thomas*, 321 F.3d 627, 636 (7th Cir. 2003).

Some of our cases cited by the government, however, use broad language that seems to support the argument that a "substantial connection" to a location is sufficient to establish a nexus to specific items of contraband in the location. See *Richardson*, 208 F.3d at 632 ("[I]t is apparent that Richardson had a substantial connection to the house . . . . This is enough to prove that Richardson had control over the property and to establish a nexus between the contraband and Richardson."); *United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir. 1995) ("If [Kitchen] in fact resided at Williams's home, then he had the power to exercise control over the two firearms."); *Morris*, 576 F.3d at 667 ("In the absence of exclusive control, evidence that a defendant had a 'substantial connection' to the location where contraband was seized is sufficient to establish the nexus . . . ."); *United States v. Caldwell*, 423 F.3d 754, 758 (7th Cir. 2005) ("The foregoing evidence provided the jury with a rational basis to conclude that the 4758 S. Lawler home was Caldwell's residence at the time in question, which is sufficient to establish that he had constructive possession of the firearms seized there."); *United States v. Alanis*, 265 F.3d 576, 592 (7th Cir. 2001) ("We have repeatedly held that 'constructive possession may be established by a showing that the firearms was seized at the defendant's residence.' "), quoting *United States v. Walls*, 225 F.3d 858, 867 (7th Cir. 2000).

When we look more closely at the facts, the tension between these two lines of cases can be resolved. Not-

withstanding the broader "substantial connection" language in the joint residence cases cited by the government, in each one something more than the defendant's residence linked him to the contraband. The facts demonstrated not just a substantial connection between the defendant and the location, but also a substantial connection between the defendant and the contraband itself. In *Richardson*, for example, the gun was found in Richardson's bedroom lying on his bed next to envelopes addressed to him and prescription medications with his name and the home's address on the labels. 208 F.3d at 628. Similarly, in *Kitchen*, the seized guns were recovered from a bedroom that also contained a number of Kitchen's possessions—a gold bracelet with his gang nickname, bills and papers bearing his name, and men's clothing. 57 F.3d at 519-20. In *Morris*, the defendant fled from police, and we have identified a defendant's flight as "something more" that is sufficient to overcome the mere-presence principle. 576 F.3d at 668; see also *United States v. Starks*, 309 F.3d 1017, 1025 (7th Cir. 2002). In *Caldwell*, a witness testified that he saw the defendant with the same handgun seized by government agents shortly before the time period charged in the indictment. 423 F.3d at 758. In *Alanis*, the gun was found in a nightstand next to the defendant's bed with his eyeglasses, clothing, and wallet nearby. 265 F.3d at 592.

The facts in these cases make clear that when the defendant jointly occupies a residence, proof of constructive possession of contraband in the residence requires the government to demonstrate a "substantial connection" between the defendant and the contraband itself, not

just the residence. See *Castillo*, 406 F.3d at 813 ("[I]f the defendant jointly occupies the premises, the Government must present some evidence that supports a nexus between the weapon and the defendant."); *United States v. Thomas*, 321 F.3d 627, 636 (7th Cir. 2003) ("Even where we have found constructive possession of firearms when they are found in close proximity to the defendants, the weapons were found in areas over which the defendant exercised control, such as a bedroom, garage, or workplace.") (internal citations omitted).

This approach is consistent with the approach taken by our colleagues in several other circuits. For example, in *United States v. Bonham*, 477 F.2d 1137 (3d Cir. 1973) (en banc), the Third Circuit explained:

> When a person is the sole occupant of a room and has the right to exclude all others from it, it may logically be inferred that he has knowing dominion and control over objects so situated in his room that he is likely to be aware of their presence. But the situation is different where two persons share the occupancy of a room and the right to exclude others from it. Depending on the circumstances, either or both may have knowing dominion and control over a particular chattel, and choice between these alternatives must be based on more than speculation.

*Id.* at 1138 (internal citation omitted). Accord, *e.g.*, *United States v. Reese*, 775 F.2d 1066, 1073 (9th Cir. 1985) ("Although the firearms were discovered at Reese's house, Reese was not the only person residing there at the

time the guns were found. Where, as here, a residence is jointly occupied, the mere fact that contraband is discovered at the residence will not, without more, provide evidence sufficient to support a conviction based on constructive possession against any of the occupants."); *United States v. McCane*, 573 F.3d 1037, 1046 (10th Cir. 2009) ("When a defendant has exclusive possession of the premises on which a firearm is found, knowledge, dominion, and control can be properly inferred because of the exclusive possession alone. However, in cases of joint occupancy, where the government seeks to prove constructive possession by circumstantial evidence, it must present evidence to show some connection or nexus between the defendant and the firearm. Proximity alone is insufficient to establish knowledge and access to (and dominion and control over) a firearm in a joint occupancy case.") (internal quotation marks and citations omitted); *United States v. Ford*, 993 F.2d 249, 252 (D.C. Cir. 1993) ("[I]n cases in which contraband or firearms are discovered in a place occupied by more than one person, the Government must establish the likelihood that in some discernable fashion the accused had a *substantial* voice vis-à-vis the items in question. In other words, the Government cannot rest its case on the mere circumstance that a defendant was close to or had access to the illegal items; there must be some action, some word, or some conduct that links the individual to the illegal items and indicates that he has some stake in them, some power over them.") (internal quotation marks and citations omitted); see also *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993) ("Although we

do not adopt the 'affirmative link' test adopted by some of these courts, we do believe that something else (e.g., some circumstantial indicium of possession) is required besides mere joint occupancy before constructive possession is established.") (internal citation omitted).

The government contends that it had "something more" in this case to link Griffin to the seized firearm and ammunition. The government urges that Griffin's "intent to possess the firearm and ammunition of which he was convicted is best shown by his failure to separate himself from them despite his practical knowledge that this was necessary," and that Griffin knew "as a prohibited person he was not supposed to live in a residence where those guns were kept." This argument is not persuasive for two reasons. First, even when viewed in the generous light we must cast in support of the jury's guilty verdict, the cited evidence simply does not show what the government says it shows. Even if we assume that Griffin knew that his father's guns had been removed from the house in 2004 in connection with Griffin's arrest at that time, that knowledge does not translate into proof that Griffin knew that "as a prohibited person he was not supposed to live in a residence where those guns were kept."

Along the same lines, there is no evidence that Probation Officer Perry communicated to Griffin himself her advice that "someone under her supervision" who discovers a gun in his residence should contact her immediately to receive a new residential placement. Nor is there any evidence that Griffin knew of

Perry's direct warning to his father regarding guns in the house. (We put aside for this case the question whether failure to comply with an overly conservative warning would be evidence of unlawful possession.) Thus, none of the evidence cited by the government actually supports a finding that Griffin intended to exercise dominion or control over the guns and ammunition.

This argument suffers from a second, more fundamental problem. It confuses access with possession. Neither the felon-in-possession statute nor the terms of Griffin's conditional release prohibited him from living in a home where firearms were otherwise lawfully present. Both prohibit only *his* possession of firearms and ammunition. We recognize that Griffin's easy access to the weapons may have meant that, sitting in the kitchen, he was capable of violating the felon-in-possession statute in a matter of seconds. Without more, however, that easy access does not mean that he actually violated the felon-in-possession statute by intending to exercise control over any of the firearms. "A jury cannot speculate its way out of reasonable doubt." *Katz*, 582 F.3d at 752. Accordingly, the previous seizure of the firearms, what Probation Officer Perry presumably told Griffin's father during their phone call, and what conclusions Griffin may or may not have drawn from the previous gun seizure and his meeting with Perry are all insufficient to show constructive possession by Griffin himself.

Nor does Mario Walker's testimony provide the "something more" missing from the government's case. As

in many cases of supposed confessions to other pris-
oners, the credibility of Walker's testimony was subject
to attack, but in light of the jury's verdict, we accept it
at face value for purposes of appeal. The critical problem
with Walker's testimony is that it did not attribute to
Griffin possession of the specific shotgun or ammunition
for which he was convicted. Walker testified that Griffin
had told him that two handguns hidden behind the
stove were his. No handguns were actually found
behind the stove, and the jury also did not find Griffin
guilty of possessing any handgun or even any of the
shotguns behind the refrigerator. We must assume that
the jury did not believe Walker on that point, or at least
did not believe him unanimously and beyond a rea-
sonable doubt.

The government discounts the absence of testimony
from Walker tying Griffin to the specific shotgun and
ammunition for which he was actually convicted. The
government argues that the jury could have inferred
from Walker's testimony about Griffin's connection to
*some* of the guns seized from the residence that, at a
minimum, he intended to exercise control over the
firearm most readily at hand. There were, however, five
guns located in the kitchen, apparently mere steps
apart. We cannot discern how the gun behind the door
was any more readily available than the guns behind
the refrigerator, such that a non-arbitrary distinction can
be drawn between them. Walker's testimony also
failed to provide the "something more" the government
needed to prove that Griffin constructively possessed
the shotgun and ammunition for which he was convicted.

III. *Conclusion*

Even when we construe the evidence and all of the reasonable inferences that can be drawn from it in the light most favorable to the government, the evidence was not sufficient to support a finding, beyond a reasonable doubt, that Griffin intended to exercise control over his father's shotgun and the nearby ammunition. Griffin's conviction is therefore REVERSED.