In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1706

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIE GONZALEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:13-cr-30201-DRH-1 — **David R. Herndon**, *Judge*.

ARGUED JANUARY 27, 2016 — DECIDED MARCH 25, 2016

Before POSNER, KANNE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. A jury found appellant Willie
Gonzalez guilty of conspiracy to distribute methampheta-
mine, 21 U.S.C. §§ 846, 841(a)(1), possession with intent to dis-
tribute methamphetamine, § 841(a)(1), and possession of a
firearm in furtherance of a drug-trafficking crime, 18 U.S.C.
§ 924(c)(1)(A). He was sentenced to concurrent terms of 360
months in prison for the drug crimes plus a consecutive 60
months for the firearm offense.

On appeal he challenges only the sufficiency of evidence on his conviction on the drug possession count, arguing that the government failed to prove beyond a reasonable doubt that he possessed the four pounds of methamphetamine found in the lining of a cooler in a co-defendant's home in a search on September 15, 2013, where both the co-defendant and Gonzalez were present. The issue on appeal is whether a rational jury could have found beyond a reasonable doubt that Gonzalez possessed the drugs. See *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014). We affirm.

I.    *Constructive Possession*

The government offered sufficient circumstantial evidence that Gonzalez had constructive possession of the methamphetamine. Constructive possession is sufficient to prove criminal possession under 21 U.S.C. § 841. *United States v. Lawrence*, 788 F.3d 234, 239–40 (7th Cir. 2015); *United States v. Cejas*, 761 F.3d 717, 728 (7th Cir. 2014). A defendant constructively possesses an item over which he exercises "ownership, dominion, authority, or control." *United States v. Parra*, 402 F.3d 752, 761 (7th Cir. 2005).

The government had to prove that Gonzalez had "the authority—not legal authority, but the 'recognized authority in his criminal milieu'—to possess and determine the disposition" of the methamphetamine in the cooler. See *United States v. Starks*, 309 F.3d 1017, 1022 (7th Cir. 2002) (internal citations omitted); see also *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012) (intent to control item required for constructive possession includes control through others); *United States v. Manzella*, 791 F.2d 1263, 1266 (7th Cir. 1986) (constructive possession is designed "to take care of such cases as that of a drug

dealer who operates through hirelings who have physical possession of the drugs," and drugs need not be on premises defendant occupies).

The government's theory was that Gonzalez, headquartered in California, distributed methamphetamine in the St. Louis, Missouri area through co-defendant Daniel Hernandez, in whose home the drugs were found, and that Gonzalez had recently shipped the drugs to Hernandez for distribution under Gonzalez's direction. To prove Gonzalez's constructive possession, the government needed to prove that the drugs recovered were those sent by Gonzalez and that he maintained control over the drugs after they were shipped to Hernandez. We turn to the government's evidence, giving the government the benefit of any conflicts in the evidence and reasonable inferences from the evidence. See *United States v. Patel*, 778 F.3d 607, 619 (7th Cir. 2015); *Griffin*, 684 F.3d at 693.

II. *The Government's Evidence*

In early 2013 an informant bought methamphetamine from a street dealer in St. Clair County, Illinois, across the river from St. Louis. Agents of the federal Drug Enforcement Administration worked their way up the supply chain to Zachary Weil, an area resident. When confronted by the DEA, Weil acknowledged he had been distributing "ice," a street name for a particularly potent form of methamphetamine hydrochloride. Weil agreed to cooperate. He identified his suppliers as Daniel Hernandez and defendant Willie Gonzalez, also known as "Smokey" and "Bullet" respectively.

Weil's relationship with Gonzalez had begun in 2011. Weil owed money to another drug dealer, so Gonzalez let Weil work for him to earn money to pay off that debt. Weil's first

load was five pounds of methamphetamine. During the first few months of 2013, Weil had sold 30 to 60 pounds of methamphetamine provided by Gonzalez, priced between $16,000 and $20,000 per pound. (Weil had another supplier from Las Vegas who was investigated separately by DEA agents in Missouri.) Gonzalez lived in California but told Weil that he would designate Hernandez as a local go-between to provide Weil with drugs and collect money from him. Once Hernandez was involved in the operation, Weil received all drugs from Hernandez and delivered all money to him. Gonzalez remained in charge of the operation.

Beginning in July 2013, Weil made a series of recordings of telephone conversations with Hernandez and Gonzalez and meetings with Hernandez. During a conversation on July 19, 2013, Weil and Hernandez discussed a quantity of methamphetamine that Hernandez had provided to Weil without Gonzalez's permission. During that conversation the two men also discussed a $5,000 payment that Weil had made to Hernandez toward his outstanding debt, but which Hernandez had not yet reported to Gonzalez. Weil and Hernandez discussed these same subjects again on July 25.

Hernandez also told Weil that Gonzalez intended to send a courier to St. Clair County with a new load of methamphetamine. In later conversations Hernandez told Weil that Gonzalez planned to travel to Illinois but would send the courier with the drugs ahead of his arrival. They also discussed the possibility of working with Gonzalez to sell cars to pay off some of their debts, as well as the fact that Gonzalez was supposed to pay Hernandez's rent but had not done so for several months.

In August 2013, six men beat Weil—his nose and an eye socket were broken—and then put him on the telephone with Gonzalez, who told Weil that he had discovered accounting errors and demanded the money he was owed. In the weeks following that beating, Weil and Gonzalez spoke by telephone several more times. Gonzalez disclosed that he knew Hernandez had misreported the amount Weil owed him. The discrepancy, said Gonzalez, was the reason he had ordered the beating. Gonzalez added that he would wait to square Weil's account until after sending more drugs to Illinois. Gonzalez confirmed, as Hernandez had told Weil previously, that a courier would arrive with the methamphetamine before Gonzalez himself would arrive. Gonzalez said he would be "out there in a little bit," and he told Weil to line up buyers for the new shipment.

On September 14, 2013, Hernandez told Weil that he had received the drugs and that Gonzalez was coming later in the day. Weil set up a controlled buy of two ounces. Weil later proposed increasing the amount to half a pound. Hernandez replied that he would need approval from Gonzalez. Later that same day, Weil received half a pound from Hernandez.

On September 15 investigators executed a search warrant at Hernandez's apartment in St. Clair County. Four people, including Hernandez and Gonzalez, were present. The investigators found approximately four pounds of "ice" in the lining of a cooler located in a bedroom. The investigators also recovered packaging (some of which had "residue" on it that investigators thought "probably" came from the half a pound sold to Weil the day before), two guns, an accounting ledger, and vehicle titles.

Gonzalez, Hernandez, Weil, and the dealers who led the DEA to Weil were charged together in a multi-count indictment. In Count 2, the only one at issue, Gonzalez and Hernandez were charged with possessing the methamphetamine found in Hernandez's apartment on September 15. All defendants except Gonzalez pled guilty, and all but Hernandez testified against Gonzalez. Five investigators also testified and acknowledged that no fingerprints or other forensic evidence tied Gonzalez to the items recovered at Hernandez's apartment. Gonzalez did not testify or call any witnesses.

III. *Analysis*

Gonzalez argues that the government relied on his "mere presence" at Hernandez's apartment to connect him to the methamphetamine found in the cooler and thus failed to show constructive possession. He compares his case to *United States v. Herrera*, 757 F.2d 144 (7th Cir. 1985), and *United States v. Windom*, 19 F.3d 1190 (7th Cir. 1994).

In *Herrera*, the defendant was arrested after leaving a residence with a brown paper bag containing heroin. *Herrera*, 757 F.2d at 147. He was convicted of, among other things, possession of heroin found in a footlocker within the residence. We reversed that conviction: "The only certain link between Herrera and the footlocker is that the footlocker was in the house when Herrera picked up the heroin." *Id.* at 150.

Similarly, in *Windom* the police made a controlled buy of heroin from a house where the defendant was found during a later search. He had a large sum of cash, including $20 from the controlled buy. *Windom*, 19 F.3d at 1193. The defendant was convicted of, among other counts, possession of heroin

found in a backpack located in the house. Because no evidence was introduced linking Windom to the backpack, we also reversed that conviction. *Id.* at 1200–01. In neither case did the defendant have sufficient ties to the location from which possession of the drugs reasonably could be inferred.

Gonzalez, however, had a substantial tie to Hernandez's apartment: he paid the rent. Hernandez complained that he had not done so for several months, but the tie was still relevant in connecting Gonzalez to the drugs in Hernandez's apartment. And there was much more circumstantial evidence that Gonzalez had at least joint possession of the four pounds of methamphetamine in Hernandez's apartment.

Gonzalez argues that there was insufficient evidence of a connection between him and the four pounds of methamphetamine because, in their recorded conversations, he, Weil, and Hernandez had discussed a large shipment of methamphetamine only in vague terms and had never discussed specific quantities or how the drugs would be packaged. It is true that no eyewitness testimony linked the expected shipment with the methamphetamine in the cooler, nor did any forensic testing match the drugs sold to Weil on September 14 with the drugs found in the cooler.

Unlike *Herrera* and *Windom*, however, there was strong circumstantial evidence of control by Gonzalez. The timing of the conversations about the shipment, which led up to the sale to Weil the day before the seizure, allowed the jury to infer that the drugs recovered were those sent by Gonzalez. See *United States v. Jones*, 763 F.3d 777, 800 (7th Cir. 2014) (constructive possession was proven because, in part, during weeks leading up to seizure of crack cocaine, defendant had sought to obtain distributable quantities of crack).

From July through the beginning of September, Gonzalez, Hernandez, and Weil had discussed Gonzalez's plan to travel from California to Illinois after sending ahead a shipment of methamphetamine. On September 14, Hernandez told Weil that the drugs had arrived and that Gonzalez would be arriving later that day. That same day Weil purchased half a pound of methamphetamine from Hernandez. The following morning, investigators found Gonzalez in Hernandez's apartment along with Hernandez, four pounds of methamphetamine, and discarded packaging that tied the drugs found in the apartment with the half a pound delivered by Hernandez the night before to Weil.

Additional evidence showed that, during the months before the September 2013 seizure, Gonzalez had maintained control over drugs after they were sent from California to Hernandez. Weil testified that he was required to do business with Gonzalez through Hernandez; Hernandez received drugs from Gonzalez and doled them out to Weil, who would pay Hernandez instead of Gonzalez directly. These arrangements provide strong circumstantial support that Gonzalez had at least joint possession over large quantities of drugs in Hernandez's apartment. See *United States v. Hernandez*, 13 F.3d 248, 252 (7th Cir. 1994) ("The conclusion that Serrano had the power to possess the cocaine is further supported by the evidence that between the two of them, Serrano was in charge."); *United States v. McAnderson*, 914 F.2d 934, 947–48 (7th Cir. 1990) (finding evidence of constructive possession of firearms when high-ranking member of gang participated in recorded conversations planning use of firearms); *United States v. Espinoza*, 684 F.3d 766, 777 (8th Cir. 2012) (finding sufficient evidence of constructive possession when defendant was

aware of shipments to stash house, directed others' sales from stash house, and received proceeds from those sales).

Along with the drugs, the investigators recovered an accounting ledger that, as one agent testified, "had numbers matching what Daniel Hernandez and Zach Weil were talking about on recordings." And despite Gonzalez's current assertion to the contrary, there is no evidence that Hernandez had another methamphetamine supplier. It is true that Hernandez gave Weil amounts of methamphetamine without Gonzalez's permission. But the fact that the two men felt compelled to hide these transactions from Gonzalez, who was angry when he discovered Hernandez's inaccurate accounting, shows that Hernandez was not allowed to act without permission from Gonzalez. Hernandez needed permission to sell Weil just half a pound of methamphetamine, as opposed to two ounces, the night before Gonzalez's arrest. The government thus presented sufficient evidence to allow the jury to conclude beyond a reasonable doubt that Gonzalez maintained control over the drugs in Hernandez's apartment. See *Starks*, 309 F.3d at 1022 ("Constructive possession need not be exclusive, and can be shared with others.").

A rational jury could find from the evidence at trial both that the drugs recovered were the same drugs discussed in the recordings—the shipment that Gonzalez planned to send by courier from California ahead of his own his arrival—and that Gonzalez retained control over those drugs after they arrived in Illinois. Gonzalez's conviction on the possession count is

AFFIRMED.