In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2814

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEENAN DAVIS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:16-cr-00055-TLS-SLC-1 — **Theresa L. Springmann**, *Chief Judge.*

ARGUED MAY 15, 2018 — DECIDED JULY 24, 2018

Before BAUER, KANNE, and HAMILTON, *Circuit Judges*.

BAUER, *Circuit Judge.* Keenan Davis was charged with and convicted of two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), arising from two unrelated incidents. Davis appeals three evidentiary rulings as to testimony from three witnesses, and argues that the government failed to provide sufficient evidence to prove Count Two.

Count One arose from an incident that occurred on July 20, 2016. Davis drove with his girlfriend, Heather Gaff ("Heather"), to the home of Anthony Wamue and Jacqueline Gaff ("Jackie"), Davis's ex-girlfriend and Heather's sister. The visit quickly resulted in a fight, starting inside the house and then moving to the backyard; the fight involved Davis, Jackie, and Wamue. Police were called and arrived shortly after and found a firearm lying on the curb outside the house.

Davis's theory at trial was that the gun was Jackie's or Wamue's, both convicted felons, who set up Davis knowing they would face the same charges if the gun was found to be theirs. The government presented evidence to prove that Davis brought the gun to the house. On appeal from the conviction on Count One, Davis objects to testimony from Officer Matthew Cline, one of the responding police officers, as to prior consistent statements made by Jackie and Wamue on the day of the incident, and testimony from Davis's six-year-old daughter.

After the police arrived, Jackie and Wamue recounted the altercation to Officer Cline. At trial, the government called Jackie to testify, but during cross-examination, she could not recall many of the details of the incident. Later in the trial, the government called Officer Cline to testify about incriminating statements made by Jackie and Wamue against Davis on the day of the incident. No objection was made to this testimony.

The government also called C.D., Davis's six-year-old daughter, to testify at trial. Prior to trial, Davis filed a motion under 18 U.S.C. § 3509(c) requesting that the district court hold a child competency hearing before allowing C.D. to testify. The

court agreed and questioned C.D. outside the presence of the jury regarding her ability to distinguish truth and falsehood. After this questioning, defense counsel agreed that C.D. was competent and did not object to her testifying.

C.D. testified that she was in a bedroom towards the back of the apartment when Davis arrived and came out when she heard loud noises in the front of the apartment where Davis, Jackie, and Wamue were fighting. She also testified that she never saw the gun during the incident, but knew there was a gun because Jackie, her mother, told her Davis had a gun.

Count Two arose from an incident that occurred on August 30, 2016, when police executed a warrant for Davis's arrest. During a pat down of Davis, an officer found a Crown Royal bag tied to his boxer shorts. While executing the arrest, officers also saw a revolver barrel sticking out of a Crown Royal bag in the mudroom of the house. The officers then obtained and executed a search warrant for the home. During this search, they discovered the firearm was a disassembled, stolen revolver. Additionally, the officers found a third Crown Royal bag in a basement crawl space inside a partially un-screwed and open air duct, lying next to a gun lock.

At the time of his arrest, Davis lived with six other individuals in his home: Heather; Heather's mother, Michelle; Davis's 23-year-old son Keenan Davis, Jr. (J.R.); Molly Cobb; James "Jim Bob" Sullivan; and a man named Reggie.

Davis and Heather were running a transportation company out of their home, providing safe rides home for intoxicated people; Davis kept the home running and paid the bills to keep the gas and electricity on in the home. After Davis's arrest, the

six individuals had to move first to a motel, then a small apartment.

At trial, the government's theory was that the revolver belonged to Davis. The government called several witnesses and introduced into evidence calls Davis received from jail. The testimony and evidence was conflicting as to the owner of the revolver. On appeal, Davis contests the government calling J.R. to testify, and argues that the government failed to provide sufficient evidence to prove the gun belonged to him.

Before calling J.R. to the stand, the district court held a bench conference with counsel where the government requested permission to treat J.R. as a hostile witness. The government told the court that they had attempted to contact J.R. to meet with them before trial, but he failed to respond. The district court then asked both counsel if either of them would like a *voir dire*, but neither accepted. The district court asked the government how long it anticipated the questioning would take to determine whether the court should give the jury a short break. The government responded, "I only have to get one thing out of him. I anticipate he's going to deny making that statement, which will then trigger another witness." Defense counsel did not object, and the district court allowed the government to proceed.

During the search of Davis's home, Special Agent Wayne Lessner had questioned J.R. about the guns the agents found. At trial, J.R. denied telling Agent Lessner that the gun was Davis's; instead, he testified that he had told the agent the gun belonged to him but later testified that he told the agent he had never seen the gun before. The government then called

Agent Lessner to testify about his conversation with J.R. on the day of the search. Agent Lessner testified that he asked J.R. if any firearms were in the home, and that J.R. responded that his father had a "smaller" black revolver. He then showed J.R. the barrel of the revolver in the Crown Royal bag and asked if that was the firearm he was referring to. After a few seconds of hesitation, J.R. replied, "yes."

At the conclusion of its case-in-chief, the government played 18 recorded jail calls between Davis and either Heather or J.R. Some of the recorded conversations tend to suggest that Davis tried to influence J.R. in assisting his way out of the charges.

At the close of the government's case, defense counsel moved for acquittal on both counts. The court took the motion under advisement, defense counsel renewed the motion at the close of all evidence, and the court ultimately denied it. The jury found Davis guilty on both counts, and the district court sentenced Davis to 100 months' imprisonment and two years of supervised release.

## I. ANALYSIS

### A. Evidentiary Issues

Davis argues the district court made three evidentiary errors, each in regard to testimony from witnesses at trial. Davis concedes he did not object at trial, thus we review for plain error. *United States v. Quiroz*, 874 F.3d 562, 569 (7th Cir. 2017). We will exercise our discretion and reverse only if the error "seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (quoting *United*

*States v. Kibler*, 279 F.3d 511, 514 (7th Cir. 2002)). This standard of review "is an exceedingly deferential standard, and one under which we will reverse in only the most exceptional circumstances." *Quiroz*, 874 F.3d at 569.

### i. Prior Consistent Statement

Davis first argues the district court erred by admitting prior consistent statements from Jackie and Wamue through Officer Cline to prove Count One. Federal Rule of Evidence 801(d)(1)(B) states:

> (d) A statement that meets the following conditions is not hearsay:
>
>> (1) The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
>
>   …
>
>>> (B) is consistent with the declarant's testimony and is offered:
>>>
>>>> (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
>>>>
>>>> (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground.

Davis argues this rule requires that a prior statement must have been made before the declarant had a motive to fabricate,

pointing us to the Advisory Committee's note for the 2014 Amendments. This note upholds the finding in *Tome v. United States*, 513 U.S. 150 (1995) and states, "under Rule 801(d)(1)(B), a consistent statement offered to rebut a charge of recent fabrication or improper influence or motive must have been made before the alleged fabrication or improper influence or motive arose." *Id.* at cmt. 2014 Amendment. Davis argues Jackie and Wamue, as prior felons, had reason to fabricate their stories to Officer Cline at the scene of the incident on July 20, 2016, thus he says these statements should not have been allowed. However, since *Tome*, the language found in Rule 801(d)(1)(B)(ii) has been added, and the language analyzed in *Tome* is now found under Rule 801(d)(1)(B)(i). There has been no interpretation of 801(d)(1)(B)(ii) since its addition, thus making it unclear whether the rule from *Tome* applies to Rule 801(d)(1)(B)(ii) as it unequivocally does to Rule 801(d)(1)(B)(i). Davis provides no reason why we should hold the district court accountable for failing to *sua sponte* bar Officer Cline from introducing statements under such a debatable require-ment. The district court did not plainly err in admitting this testimony.

### ii. Testimony from Davis's Daughter

Davis next argues the district court plainly erred in allow-ing C.D. to testify due to the testimony's lack of probative value and unduly prejudicial nature. "A forfeited Rule 403 argument rarely results in reversal because the defendant must show that the evidence was so obviously and egregiously prejudicial that the trial court should have excluded it even without any request from the defense." *United States v. Klemis*,

859 F.3d 436, 445 (7th Cir. 2017) (quoting *United States v. Collins*, 604 F.3d 481, 487 (7th Cir. 2010)) (internal quotations omitted). This case is no exception to this rule.

In support of this contention, Davis argues that C.D.'s testimony was contradictory and thus, unreliable. He also argues her presence, as the six-year-old daughter of the defendant, was unnecessarily inflammatory. We do not to find C.D.'s testimony so obviously and egregiously prejudicial that the district court should have excluded it *sua sponte*.

### iii.  Impeachment of Davis's Son

Davis's final evidentiary argument is that the district court plainly erred in allowing J.R. to testify solely for the purpose of allowing backdoor impeachment testimony through Agent Lessner. Generally, "[a]ny party, including the party that called the witness, may attack the witness's credibility." Fed. R. Evid. 607. However, in a criminal case, the government cannot call a witness, knowing the witness is not going to give useful testimony, solely for the purpose of introducing hearsay evidence against the defendant. *United States v. Burt*, 495 F.3d 733, 737 (7th Cir. 2007). This exception is a narrow one where we must determine whether the government called the witness in bad faith. *United States v. Michael Davis*, 845 F.3d 282, 290 (7th Cir. 2016).

"[A]n attorney is entitled to assume that a witness will testify truthfully." *United States v. Patterson*, 23 F.3d 1239, 1245 (7th Cir. 1994) (quoting *United States v. Carter*, 973, F.2d 1509, 1513 (10th Cir. 1992)). It is not an abuse of Rule 607 for the government to call a witness whose anticipated testimony is unclear when the government was not afforded the opportu-

nity to meet with the witness before the witness took the stand. *See Michael Davis*, 845 F.3d at 290 ("Since the government did not know in advance the particular aspects of the [report] that [the witness] would disclaim, we find no evidence that the government acted in bad faith by calling [the] witness.").

Davis specifically takes issue with the government's statement, "I only have to get one thing out of him. I anticipate he's going to deny making that statement, which will then trigger another witness." He argues this statement implies the government's intention of solely using J.R. for impeachment purposes. We disagree.

Before calling J.R. to the stand, the district court held a bench conference where the government admitted that it anticipated he would be a hostile witness. The government made clear that it had tried to meet with J.R. before trial, but J.R. failed to respond to this request. The court then offered to hold a *voir dire*, but neither counsel accepted this offer.

With an expectation that J.R. would lie to the jury, yet no opportunity to question the witness beforehand and a failure of Davis's counsel to accept the district court's offer to hold a *voir dire*, we find the government did not abuse Rule 607, and the district court did not plainly err in allowing the government to call J.R. as a witness.

### B. Motion for Judgment of Acquittal

Finally, Davis argues the district court should have granted his motion for acquittal as to Count Two because the government failed to provide sufficient evidence for a rational jury to find that he knowingly possessed the revolver found in the

Crown Royal bag. "We review *de novo* a district court's denial of a motion for acquittal." *United States v. Willbourn*, 799 F.3d 900, 910 (7th Cir. 2015). "Defendants challenging the quantum of evidence supporting a jury verdict face a daunting task." *United States v. Luster*, 480 F.3d 551, 555 (7th Cir. 2007). We review a sufficiency of the evidence challenge "in a light most favorable to the prosecution and will reverse only if no juror could have found guilt beyond a reasonable doubt." *Id.*

To convict Davis under 18 U.S.C. § 922(g)(1), the government must prove that (1) he has a previous felony conviction; (2) he possessed the firearm or ammunition; and (3) the firearm or ammunition had traveled in or affected interstate or foreign commerce. *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). Davis only disputes the second element, whether there was sufficient evidence to find that he knowingly possessed the revolver. The government does not argue actual possession, thus we will focus on whether the government provided sufficient evidence to prove constructive possession.

"Constructive possession is a legal fiction whereby an individual is deemed to 'possess' contraband items even when he does not *actually* have immediate, physical control of the objects." *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). "Constructive possession may be established by demonstrating that the defendant knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others." *Griffin*, 684 F.3d at 695. "This required 'nexus' must connect the defendant to the contraband," and may be established in one of two ways. *Id.* The government can show that Davis had either "exclusive control"

over the property where the revolver was found, or a "substantial connection" to the location where the revolver was found. *Id.* at 695–96. In the case of a joint residence, the evidence should show a substantial connection between the defendant and both the property *and* the contraband. *Id*. at 696–97.

"[M]ere proximity to contraband is not enough to establish a sufficient nexus." *Id.* at 696. "Rather, proximity coupled with evidence of some other factor—including connection with [an impermissible item], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise is enough to sustain a guilty verdict." *Id.* (quoting *Morris*, 576 F.3d at 668) (internal quotation marks omitted). "The government may prove constructive possession through direct as well as circumstantial evidence." *Morris*, 576 F.3d at 666.

The government argues three facts, taken together, provide sufficient circumstantial evidence to connect Davis to the revolver and support the jury's conclusion: (1) the government's establishment of Davis as the head of the household; (2) the discovery of three Crown Royal bags in the apartment, one holding the revolver and a second tied to Davis's pants; and (3) a reasonable inference that J.R. lied in his testimony to protect his father, as well as the jail calls that allowed a jury to conclude Davis attempted to influence J.R.'s testimony. All of this taken together, the government argues, provides sufficient circumstantial evidence to conclude Davis constructively possessed the revolver. We agree.

In *Griffin*, we found the evidence and reasonable inferences that could be drawn insufficient to support a finding that the defendant intended to exercise control over the guns found in his home. *See* 684 F.3d at 698–99. There, the defendant, whose father was an avid hunter, lived with his parents who owned several guns. *Id*. at 693. We concluded that the evidence merely showed access, not possession. *Id.* at 698. Here, we find important distinctions in the government's evidence not found in *Griffin*.

First, there was no contradicting testimony as to the owner of the firearms found in the home in *Griffin*, unlike the testimony here. Sullivan, a resident of Davis's home, testified he had  never seen the Crown Royal bag or any firearms in the home. Heather testified that when she found the Crown Royal bag, Reggie claimed ownership. However, on a jail call with Davis, he and Heather discussed the possibility that a man named Jamon owned the gun. Agent Lessner testified that on the day of the incident, J.R. told him the revolver was his father's. However, on the stand, J.R. denied that he ever told Agent Lessner the gun was his father's. Instead, he first testified that he told the agent it was his, but later testified that he told the agent he had never seen the gun before.

Second, the defendant in *Griffin* was living with his parents and indisputably not the head of the household, unlike the reasonable conclusion the evidence showed here. Davis paid the bills, and when he was incarcerated, the others living in the apartment had to move to a motel and then a small apartment. In Heather's testimony, she agreed that Davis was "the one that really fed and took care of everybody" in the house.

Finally, there was no circumstantial evidence connecting the defendant to the firearm in *Griffin*, unlike here, where a reasonable jury could conclude that the circumstantial evidence of the Crown Royal bags connected Davis to the revolver. Three Crown Royal bags were discovered in the apartment. The first was found tied to the inside of the boxer shorts Davis was wearing when he was arrested; the second was found in the laundry room and contained the revolver; and the third was found in the basement next to a gun lock. Because one bag was found on Davis's person and the only other two found in the apartment were in common areas of the home, a reasonable jury could conclude that all three belonged to Davis. We find that all of this evidence, taken together, is sufficient for a juror to find a nexus between Davis and the revolver.

## II.  CONCLUSION

For the foregoing reasons, we AFFIRM.